Filed 3/10/15

CERTIFIED FOR PARTIAL PUBLICATION[*]

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| THE PEOPLE, | B245674 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. TA118178) |
| v. | |
| CLYDE WESLEY ANDERSON, | |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Los Angeles County, Kelvin D. Filer, Judge. Affirmed.

Gail Harper, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Lance E. Winters, Assistant Attorney General, James William Bilderback II and Steven E. Mercer, Deputy Attorneys General, for Plaintiff and Respondent.

_____

[*] Pursuant to California Rules of Court, rules 8.1100 and 8.1110, this opinion is certified for publication with the exception of section II.

Clyde Wesley Anderson appeals from his conviction for the murder of Dominique McDaniel on three grounds: that he was deprived of representation by competent counsel at his preliminary hearing; that there is insufficient evidence to support his murder conviction; and that there is insufficient evidence to support the gang enhancements. We disagree, and affirm the judgment.

**Background**

Anderson was charged by amended information with the first degree murder of Dominique McDaniel (Pen. Code, § 187, subd. (a)), and the attempted murder of Brandy Smallwood (Pen. Code, §§ 187, subd. (a), 664).[1] The information alleged as to both counts that Anderson personally and intentionally discharged a firearm causing great bodily injury and death (§ 12022.53, subds. (d) & (e)(1)); that he personally and intentionally discharged a firearm (§ 12022.53, subds. (c) & (e)(1)); that he personally used a firearm (§ 12022.53, subds. (b) & (e)); and that the offense was committed for the benefit of, at the direction of, and in association with a criminal street gang with the specific intent to promote, further and assist in criminal conduct by gang members (§ 186.22, subd. (b)(1)(C)), causing the offense to be classified as a serious felony (§ 1192.7, subd. (c)(28)). A number of prior juvenile and serious felony convictions were alleged. Anderson pleaded not guilty to the charged offenses and denied the special allegations.

A jury acquitted Anderson of the attempted murder of Smallwood, but deadlocked (one juror favoring acquittal) on the charged murder of McDaniel. Following a second trial for the murder of McDaniel, the jury convicted Anderson of first degree murder and found the firearm and gang allegations true. In a bifurcated court trial the court found true three prior strike allegations.

The court sentenced Anderson to 115 years to life in prison: 25 years to life in prison for the murder, tripled to 75 years to life under the "Three Strikes" law (§§

---

[1] All statutory references are to the Penal Code unless otherwise specified.

1170.12, subds. (a)-(d); 667, subds. (b)-(i)); an additional 25 years for the firearm discharge enhancements (§ 12022.53, subds. (d), (e)(1)); and an additional five years, consecutive, for each of the three prior serious felony convictions (§ 667, subd. (a)(1)).

**Underlying Events**

Late in the morning of Easter Sunday, April 24, 2011, Smallwood and her friend McDaniel (who was then 18, about six years younger that Smallwood) left Smallwood's sister's house, in the Compton area of Los Angeles. Having just fought with her niece, Smallwood took with her a knife from her sister's kitchen, which she gave to McDaniel.

As Smallwood and McDaniel walked past a group of people standing outside a house, a man (later identified as Anderson) approached them, asking "How old is she"—referring to McDaniel—"smoking a cigarette?" Smallwood replied that "she's old enough," and Anderson responded, "She looks like she's 12." McDaniel, wielding the knife, stepped toward Anderson, saying "Blood, I'm BPS," or "this is BPS."[2] "I'm old enough," or "You're going to be fucked up."

Anderson then followed Smallwood and McDaniel as they walked on, and McDaniel turned and talked with Anderson, still holding the knife. Smallwood did not hear the exchange, but then heard Anderson say and repeat, apparently to someone standing nearby, "Cuz, get the burner." To Smallwood, "Cuz" referred to the Crips gang; and "Get the burner" referred to a gun. McDaniel was still angry, but Smallwood pulled her away and they continued up the street. When Smallwood turned around after walking for a minute or more, Anderson was behind them. McDaniel turned around, spread her arms, palms up, and asked him, "What you going to do?" Anderson pulled a gun from his jacket, put his arm around McDaniel, and with the gun to her chest he fired the gun. McDaniel fell, and—according to Smallwood—Anderson then pointed the gun at her, but did not shoot. McDaniel died at the scene.

---

[2] The BPS identification referred to a "Black P-Stone Blood" gang affiliation.

3

**Discussion**

## I. Anderson Is Not Entitled To Have The Information Set Aside.

Anderson retained Attorney Victor Comstock to represent him, and was represented by Comstock at his September 1, 2011 preliminary hearing, at his September 15, 2011 arraignment (at which his not-guilty pleas were entered), and at a pretrial conference on October 25, 2011. At the next pretrial conference, on November 23, 2011, Comstock withdrew as Anderson's attorney and was replaced by a member of the office of the alternate public defender. On July 1, 2011, however, some months before any of these proceedings, Comstock had been placed on inactive status by the State Bar, rendering him "Not eligible to practice law."[3]

Anderson moved on February 14, 2012, to set aside the information on the ground he had been unrepresented by counsel at the September 1, 2011 preliminary hearing.[4] The prosecution expressly conceded that Comstock "was not eligible to practice law" at the time of Anderson's preliminary hearing, but argued that Anderson nevertheless was not deprived of a substantial right that would render his commitment illegal. The motion was heard, argued (briefly), and denied by the trial court on March 13, 2011, on grounds not reflected in the transcript.[5]

On appeal, Anderson reiterates that Comstock was ineligible to practice law at Anderson's September 1, 2011 preliminary hearing, constituting a per se deprivation of

---

[3] The facts showing Comstock's status are reflected in State Bar records attached as exhibits to the People's opposition to Anderson's trial court motion, and relied upon in this appeal by both Anderson and the People without objection.

[4] On January 13, 2012, Anderson was re-arraigned on an amended information, which modified only the alleged prior convictions.

[5] Anderson, the People, and the trial court all refer to section 995 as the motion's statutory basis. Section 995 provides for the information to be set aside if "before the filing thereof the defendant had not been legally committed by a magistrate," or if probable or reasonable cause for the commitment was lacking. Section 996 provides that unless the defendant moves to set aside the information, a defendant may not thereafter assert the objections enumerated in section 995.

4

his right to counsel at a critical stage of the proceeding. The People dispute this contention, because the reason Comstock had been placed on inactive status was his failure to pay his State Bar dues rather than for anything that would demonstrate a lack of professional competence to represent Anderson.

An order denying a motion to set aside the information may be reviewed on appeal from the judgment of conviction. (*People v. Pompa-Ortiz* (1980) 27 Cal.3d 519.) However, "failure to move to set aside the information [citing § 995] bars the defense from questioning on appeal any irregularity in the preliminary examination [citing § 996]." (*People v. Harris* (1967) 67 Cal.2d 866, 870.)[6]

## A. Anderson Was Deprived Of His Right To Representation By Competent Counsel At His Preliminary Hearing And Arraignment.

The right of a criminal defendant to the effective assistance of counsel at all critical stages of the prosecution is a substantial right guaranteed by the Sixth Amendment to the United States Constitution and by article I, section 15 of the California Constitution. The preliminary hearing is a critical stage of the prosecution, which is validly conducted only when the defendant is afforded the effective assistance of counsel. (Cal. Const., art. I, § 15; *Coleman v. Alabama* (1970) 399 U.S. 1, 9-10 [90 S.Ct. 1999, 26 L.Ed.2d 387, 396-397].) If a defendant is denied the effective assistance of counsel at the preliminary hearing, a substantial right has been denied. (*People v. Coleman* (1988) 46 Cal.3d 749, 772-773.)

A valid preliminary hearing is a prerequisite to the filing of an information. (§ 738.) Therefore, as the Supreme Court reaffirmed over 50 years ago, "where it appears

---

[6] Because Anderson's motion to set aside the information was brought under section 995, the question whether the rule stated in section 996 is applicable when the motion is brought on non-statutory grounds, as is appropriate when the error alleged by the motion is not known at the time of the preliminary hearing and is not reflected in the preliminary hearing transcript, does not arise in this case. (*Currie v. Superior Court* (1991) 230 Cal.App.3d 83, 90, 91 [motion to set aside information based on matters outside preliminary hearing record is nonstatutory motion, not motion under § 995]; see *Harris v. Superior Court* (2014) 225 Cal.App.4th 1129, 1144-1145, and cases referenced therein.)

5

that, during the course of the preliminary examination, the defendant has been denied a substantial right, the commitment is unlawful within the meaning of section 995, and [the information] must be set aside upon timely motion." (*People v. Elliot* (1960) 54 Cal.2d 498, 503; *People v. Napthaly* (1895) 105 Cal. 641, 644-645.) "[W]here the accused is not legally committed within the meaning of section 995 of the Penal Code, the commitment is voidable. . . . It is the same as if no preliminary examination at all had been held . . . . In such event, of course, the information must be quashed." (*People v. Elliot*, *supra*, 54 Cal.2d at p. 503.)

Anderson was represented by Attorney Comstock at the September 1, 2011 preliminary hearing, and at his September 15, 2011 arraignment. However, on July 1, 2011, Comstock had been placed on inactive status by the State Bar, rendering him ineligible to practice law. Respondent contends that because Comstock's inactive status resulted from his failure to pay bar membership dues, the record reflects nothing indicating his professional incompetence; his ineligibility to practice law therefore did not deprive Anderson of his right to representation by competent counsel at the preliminary hearing and arraignment. Anderson contends, to the contrary, that the State Bar's determinations do in fact establish Comstock's professional incompetence, compelling the conclusion that Anderson was deprived of his right to representation by competent counsel.

The Supreme Court held in *People v. Ngo* (1996) 14 Cal.4th 30, that "representation of a criminal defendant by an attorney who has been involuntarily enrolled [by the State Bar] on inactive status for MCLE noncompliance [or for any other reasons that do not necessarily establish professional incompetence or constitutionally deficient performance in representation] does not, in itself, amount to the denial of counsel." (*Id.* at p. 38.)[7] "Although the right to counsel clearly entails a right to competent representation by a licensed attorney, and although MCLE requirements clearly do *relate* to professional competence . . . , the inference is unwarranted that any

---

[7] "MCLE" stands for "mandatory continuing legal education." (*People v. Ngo*, *supra*, 14 Cal.4th at p. 32.)

6

and all noncompliance with those requirements necessarily *establishes* an attorney's professional incompetence or constitutionally deficient performance in representation following enrollment on inactive status." (*Id*. at p. 36; see *In re Johnson* (1992) 1 Cal.4th 689 [attorney suspended from practice of law following conviction of crime involving moral turpitude is not necessarily professionally incompetent].)

Under the rule of *People v. Ngo*, *supra*, Comstock's inactive status with the State Bar at the time of Anderson's preliminary hearing and arraignment is not alone sufficient to establish that Anderson was deprived of his right to representation by competent counsel at those stages of the prosecution. A suspension for failure to pay State Bar dues does not even reflect on Comstock's competence, much less does it establish his incompetence. (*People v. Medler* (1986) 177 Cal.App.3d 927, 930 [in the absence of evidence of deficient representation, suspension of attorney for failure to pay State Bar dues does not show incompetence to represent criminal defendant].)[8]

However, the record shows far more than Comstock's suspension to practice law at the time of the preliminary hearing and arraignment. It shows also that Comstock had stipulated with the State Bar to conduct that subjected him to State Bar discipline. The issue therefore is whether the facts established by Comstock's stipulation demonstrate his lack of competence to represent Anderson at the preliminary hearing and arraignment. Anderson argues that they do, and we agree.

The State Bar record establishes that on July 1, 2011, Comstock was suspended for failure to pay bar member fees. However, it also reflects that additional disciplinary proceedings were pending against Comstock at that time, based on charges filed in December 2010, arising from acts and omissions during the period from June through November 2009. On July 28, 2011, the State Bar and Comstock entered into a stipulated disposition of the pending disciplinary charges, resulting in Comstock's one-year suspension, stayed, and his placement on one-year probation with conditions that

---

[8] Anderson does not contend that the record of Comstock's performance at the preliminary hearing demonstrates any lack of professional competence.

included a requirement that he take and pass the Multistate Professional Responsibility Examination within that year.

The State Bar record summarizes the conduct that led to the stipulated disposition: "Comstock stipulated that he failed to perform legal services competently after being hired to try to win a new trial for a criminal defendant who was sentenced to 108 years to life in prison. Although he filed a timely notice of appeal, he did no work on the appeal and took no action to have himself removed as attorney of record. When the appeal was dismissed, Comstock did not inform the client to take any steps to reinstate the appeal. [¶] Although Comstock filed the notice of appeal solely to preserve the client's rights, he never advised the client that he didn't intend to represent him or that he needed to hire a new lawyer. He did not respond to letters from the California Appellate Project, which successfully had the appeal reinstated. [¶] He stipulated that he failed to perform legal services competently. He also did not reply to a bar investigator's inquiries." Comstock stipulated to the facts underlying this summary, and to the conclusions that he thereby willfully violated rule 3-700(A)(2) of the Rules of Professional Conduct,[9] and Business and Professions Code section 6068, subdivision (i).[10]

This record of the conduct that resulted in the disciplinary charges and the stipulated suspension was before the trial court when it heard Anderson's motion to set aside the information. It showed that at the time of Anderson's preliminary hearing, Comstock was suspended from the practice of law for reasons that do not themselves reflect on his professional competence. But it showed also that he was at that time under

---

[9] Rule 3-700(A)(2) of the Rules of Professional Conduct provides that "A member shall not withdraw from employment until the member has taken reasonable steps to avoid reasonably foreseeable prejudice to the rights of the client, including giving due notice to the client, allowing time for employment of other counsel, complying with rule 3-700(D), and complying with applicable laws and rules." Rule 3-700(D) requires to the client of any papers and property, and return to the client of any unearned fee.

[10] Business and Professions Code section 6068, subdivision (i) provides that it is the duty of an attorney to cooperate and participate in any disciplinary investigation or disciplinary proceeding against him.

discipline—on probation and subject to a suspension (stayed on condition of his probation)—arising from stipulated determinations that he had failed to perform legal services competently, and that he had willfully violated the law and professional rules. To this must be added Comstock's failure to perform his professional duties (which were also mandatory conditions of his probation) to inform the trial court and his client of his suspension during the proceedings, and to seek the court's permission to withdraw from representation of Anderson. (Rules of Prof. Conduct, rule 3-700(A)(2).)

The record thus showed that when Anderson moved in the trial court to set aside the information, Comstock was guilty of willful conduct demonstrating his professional incompetence and resulting harm to a client and to the court. It showed that he was then subject to discipline for that conduct. And it showed that he had violated conditions of his discipline and the Rules of Professional Conduct.[11]

Evidence of Comstock's guilt of this conduct does not necessarily establish his incompetence when he represented Anderson at the preliminary hearing and arraignment. These facts, if disputed and contradicted, might leave a court with discretion to find that Anderson had not been deprived of his right to representation by competent counsel at the preliminary hearing and arraignment. But these facts were not disputed or contradicted; the trial court had before it no contrary showing. Under the reasoning of *People v. Ngo*, *supra*, 14 Cal.4th 30, and *In re Johnson*, *supra*, 1 Cal.4th 689, the unrebutted inference that Comstock was not competent to represent Anderson at the preliminary hearing and arraignment stages of the prosecution therefore is conclusive.

---

[11] Subsequent State Bar records reflect that as of June 13, 2012, Comstock's probation was revoked, the stay of his suspension was lifted, and he was actually suspended for one year. He later failed to pass the professional responsibility exam, and was placed on inactive status.

**B. The Information Need Not Be Set Aside In The Absence Of Any Indication Of Prejudice Resulting From Anderson's Representation By Incompetent Counsel At The Preliminary Hearing And Arraignment Stages Of The Prosecution.**

Anderson contends that his trial court challenge to the denial of his right to competent counsel at his preliminary hearing and arraignment—before he was tried and convicted—was timely, requiring that the information must be set aside without a showing of actual prejudice.[12] In *People v. Pompa-Ortiz, supra*, 27 Cal.3d 519 (*Pompa Ortiz*), our Supreme Court reaffirmed the rule that if the defendant has been denied a substantial right at the preliminary hearing, the information must be set aside "upon timely motion." (*Id.* at p. 529.) But at the same time it narrowed the circumstances under which a motion may be found to be "timely" under that rule.

Until the decision in *Pompa-Ortiz*, a deprivation of competent counsel at the preliminary hearing would render the court without jurisdiction to proceed—therefore permitting the error to be raised any time, including for the first time on appeal. (*Pompa-Ortiz, supra*, 27 Cal.3d at p. 529.) But in *Pompa-Ortiz*, the court distinguished defects that are jurisdictional "in the fundamental sense of legal power to hear and determine a cause," from those that are jurisdictional but only in the sense that they may justify issuance of an extraordinary writ before trial. (*Ibid.*; see *Harris v. Superior Court, supra*, 225 Cal.App.4th at pp. 1144-1145.)

The deprivation of counsel at the preliminary hearing is in the latter category, the court held: It is a jurisdictional defect that may entitle a defendant to a writ prior to trial, but "does not necessarily deprive a trial court of the legal power to try the case if prohibition is not sought." (*Pompa-Ortiz, supra*, 27 Cal.3d at p. 529.) Following *Pompa-Ortiz,* therefore, the right to relief without any showing of resulting prejudice will be limited to pretrial challenges, that permit the matter to be "expeditiously returned to the magistrate for proceedings free of the charged defects," by application for

---

[12] Setting aside the complaint against Anderson would not bar his further prosecution for the same offenses. (§§ 999, 1387, subd. (c)(2)(C), 1387.1.)

extraordinary writ. (*Ibid.*) The *Pompa Ortiz* rule rests on the belief that a fair trial generally renders harmless any preliminary-hearing errors. (*Reilly v. Superior Court* (2013) 57 Cal.4th 641, 653; *People v. Hurtado* (2002) 28 Cal.4th 1179, 1190.)[13] But once a defendant has been tried and convicted, "irregularities in the preliminary examination procedures *which are not jurisdictional in the fundamental sense* shall be reviewed under the appropriate standard of prejudicial error and shall require reversal only if defendant can show that he was deprived of a fair trial or otherwise suffered prejudice as a result of the error at the preliminary examination." (*People v. Letner and Tobin*, *supra*, 50 Cal.4th at p. 139; *People v. Booker* (2011) 51 Cal.4th 141, 157 ["the need for a showing of prejudice depends on the stage of the proceedings at which a defendant raises the claim in a reviewing court, and not simply on whether he or she had raised the claim prior to trial"].)[14]

Here, Anderson raised the issue of his counsel's incompetence soon after its discovery, but he failed to apply for extraordinary writ based on the rule of *Pompa-Ortiz* that relief is available at that stage of the proceedings—before trial and conviction—without any showing of resulting prejudice. But Anderson has now been tried on the charge of the murder while being represented by counsel whom he does not contend was in any way incompetent—bringing him outside the *Pompa-Ortiz* rule that the right to relief without any showing of resulting prejudice will be limited to pretrial challenges that permit the matter's expeditious return to the magistrate "for proceedings free of the charged defects" (*Pompa-Ortiz*, *supra*, 27 Cal.3d at p. 529), and that render harmless any

---

[13] The court held in *People v. Letner and Tobin* that the rule it announced in *Pompa Ortiz* applies to errors challenged before trial, and not just to errors at the preliminary hearing stage of the proceedings. (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 139.)

[14] The *Pompa-Ortiz* rule applies only if the right of which the defendant has been deprived is a *substantial* right (*Reilly v. Superior Court*, *supra*, 57 Cal.4th at p. 653), as established by a showing that the error, even though not *necessarily* prejudicial, might reasonably have affected the hearing's outcome. (*People v. Standish* (2006) 38 Cal.4th 858, 863, 882-883; *People v. Konow* (2004) 32 Cal.4th 995, 1024.)

11

incompetence of counsel at his preliminary hearing. (*Reilly v. Superior Court*, *supra*, 57 Cal.4th at p. 653; *People v. Hurtado*, *supra*, 28 Cal.4th at p. 1190.) In the absence of any showing of prejudice, he is entitled to no relief.[15]

## II. Substantial Evidence Supports Anderson's Conviction.

### A. Substantial Evidence Supports The Determination That Anderson Shot McDaniel.

Anderson contends that there is "insufficient reliable, credible evidence of solid value" to sustain his conviction. His point is that no physical evidence identifies him as the shooter; the prosecution's primary evidence against him was his identification by his alleged associate, Hill, and by Smallwood, Milton, and Valdez, three eyewitnesses who had not previously seen him; and developments in the science of eyewitness identification in recent decades precludes his conviction based on these uncorroborated eyewitness identifications, rendering the evidence in this case insufficient to support his conviction.

The applicable standard of review limits our substantial-evidence inquiry to the question whether, on review of the entire record in the light most favorable to the judgment, a rational trier of fact could have found him guilty of the offense beyond a reasonable doubt. (*People v. Young* (2005) 34 Cal.4th 1149, 1180; *People v. Johnson* (1980) 26 Cal.3d 557, 578.) We may not weigh the evidence or evaluate the credibility of witnesses. We may only determine whether the evidence, and reasonable inferences that can be derived from it, are sufficient to support the verdicts. (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.)

That does not mean, however, that we limit our review only to the evidence favoring the respondent. "[O]ur task . . . is twofold. First, we must resolve the issue in the light of the *whole record*—i.e., the entire picture of the defendant put before the jury—and may not limit our appraisal to isolated bits of evidence selected by the

---

[15] Anderson has identified nothing indicating he was prejudiced by his pretrial representation by Comstock, and our review of the preliminary hearing transcript has disclosed no indication of prejudicial error.

respondent. Second, we must judge whether the evidence of each of the essential elements . . . is *substantial*; it is not enough for the respondent simply to point to 'some' evidence supporting the finding, for 'Not every surface conflict of evidence remains substantial in the light of other facts.'" (*People v. Bassett* (1968) 69 Cal.2d 122, 138, fn. omitted.) However, "[u]nless it is clearly shown that 'on no hypothesis whatever is there sufficient substantial evidence to support the verdict,'" the conviction must be affirmed. (*People v. Quintero* (2006) 135 Cal.App.4th 1152, 1162.)

Applying this standard, we must affirm Anderson's conviction for the first degree murder of McDaniel.

In finding Anderson guilty of the charged crime, the jury was presented with the question whether Anderson was involved in McDaniel's killing. No physical evidence identified Anderson as the person who shot McDaniel. But a number of witnesses testified that they saw Anderson shoot McDaniel, or saw him flee the scene of the shooting.

Smallwood, the surviving victim of the shooting, described the events leading to the shooting, and identified Anderson (whom she did not know) as the person she saw shoot McDaniel. She saw him shortly before the shooting, when he and McDaniel argued briefly and when Anderson said to his colleague "Get the burner, Cuz." Smallwood saw him point the gun, first at McDaniel as he shot her, and then again at Smallwood when he threatened to shoot her too. And she saw him then run toward the street. At a lineup a week after the shooting Smallwood identified Anderson as the shooter, from his face and his voice, although she admittedly had misidentified another, rather than Anderson, as the possible shooter when she was shown a six-pack of photographs four days after the incident. She was questioned at length about the shooter's physical characteristics, as well as about various factors that could have influenced her identification and recollection of Anderson as the shooter.

Gregory Hill, who had grown up with Anderson, provided testimony (and prior recorded statements) that he and Anderson were present at the scene of the shooting; that

McDaniel and Smallwood each had a knife, and had chased Anderson; and that Anderson had said, "Get the gun, get the gun."

Vanessa Milton testified that she was in her van with her husband, her mother, and her children on Easter Sunday, April 24, 2011, when she heard loud arguing and shouting, then a gunshot, she saw a young woman run by crying. Milton called 911, then exited her van and went to where a young lady (apparently McDaniel) lay bleeding from her chest. She testified to having heard Anderson arguing with Smallwood before she heard the shot, and she testified that Anderson had run past her—about a car-length from her, close enough to see his face—after she heard the shot. She also identified Anderson as the man who ran from the scene, from a photo six-pack a few days after the shooting, from a live lineup, and during the preliminary hearing and both trials.

A police detective testified to what Smallwood, and Milton, had told him shortly after the incident—including testimony that was not wholly consistent with Smallwood's and other witnesses' statements and recollections. And the jury saw a video taken by a surveillance camera the day of the shooting, showing Anderson leaving his girlfriend's apartment in his tan Chevrolet Suburban, which was later found parked about 500 feet from the place where McDaniel was shot.[16] The evidence revealed many inconsistencies and contradictions, including inconsistencies and contradictions in the accounts of the witnesses to the shooting incident.

Based on these observations, Anderson argues correctly that consideration should be given to the opportunity the witnesses had to observe the shooter; to the lapse of time between the shooting and when they were called upon to make an identification; to the extent to which their observations accurately describe the defendant; and to the impact that emotions might have had on their ability to accurately perceive and recall the events. But the consideration of these factors is in the hands of the jury, once the testimony is admitted into evidence. Unless it is simply beyond reasonable belief (and there was no

---

[16] A few other witnesses were called to describe their observations and descriptions of the participants in the incident. None gave a clear identification of Anderson, and many discrepancies and inconsistencies were identified.

contention at trial that such was the case here), it is sufficient to justify a jury's reliance. We are not free, as a reviewing court, to reweigh the evidence or to discount the testimony of eyewitnesses, particularly those who have given evidence without objection to their competence or to the relevance of their testimony. (*People v. Bolin* (1998) 18 Cal.4th 297, 333.) As the Legislature has provided, and our Supreme Court has affirmed, the evidence of a single witness is sufficient for proof of any fact. (Evid. Code, § 411; *People v. Rincon-Pineda* (1975) 14 Cal.3d 864, 885.) When eyewitness identification is believed by the trier of fact, after the circumstances surrounding the identification and its weight have been explored at length at trial, that determination is binding on the reviewing court. (*In re Gustavo M.* (1989) 214 Cal.App.3d 1485, 1497; see *People v. Champion* (1995) 9 Cal.4th 879, 926-927, questioned on another ground in *People v. Ray* (1996) 13 Cal.4th 313, 369, fn. 2 [eyewitness testimony, "although not overwhelming," supports verdict].)

It is beyond question that testimony based on the accounts of eyewitnesses to sudden, traumatic, and far-off events is not infallible, and that many factors can influence witnesses to such events to believe they have perceived people and events differently than actually occurred. Juries can—and should—be cautioned by courts, by counsel, and often by expert witnesses on the psychology of observation, to carefully examine and treat such evidence with caution. There undoubtedly is much to be learned about factors that influence the credibility of eyewitness testimony; but it is not the role of this court to set aside the rules that have long governed appellate review, based only on general references to modern theories on the subject.

A reviewing court may not "consider a new approach to assessing sufficiency of evidence," as Anderson suggests we should, nor wholly discount the testimony of eyewitnesses. Since our Legislature and our Supreme Court have held that eyewitness testimony, when it is determined by a jury to be true—and particularly when it is corroborated by other evidence, as it is here—is sufficient to establish the defendant's guilt, we are not free to hold otherwise. (*Auto Equity Sales, Inc. v. Superior Court of Santa Clara County* (1962) 57 Cal.2d 450, 455 [lower courts, including courts of appeal,

15

are bound by decisions of Supreme Court]; *Rotolo v. San Jose Sports & Entertainment, LLC* (2007) 151 Cal.App.4th 307, 316 [in defining law Court of Appeal defers to Legislature and Supreme Court].)

**B. Substantial Evidence Supports The Determination That Anderson Committed The Shooting For The Benefit Of, At The Direction Of, Or In Association With His Gang.**

Anderson argues that the evidence is insufficient to support the jury's "true" determination that he committed the shooting for the benefit of, at the direction of, or in association with his gang. We do not agree.

The Street Terrorism Enforcement and Prevention Act imposes penal consequences when crimes are committed "for the benefit of, at the direction of, or in association with any criminal street gang." (§ 186.22, subd. (b)(1); *People v. Gardeley* (1996) 14 Cal.4th 605, 609-610, 615.) In order to come within this provision, the crime must have been committed with the specific intent to promote or assist criminal conduct by gang members. (§ 186.22, subd. (b)(1); *People v. Stallworth* (2008) 164 Cal.App.4th 1079, 1104.) The Act defines a "criminal street gang" as any ongoing association of three or more persons that shares a common name or common identifying sign or symbol; that has as one of its primary activities the commission of specified criminal offenses; and that engages through its members in a pattern of criminal gang activity. (§ 186.22, subd. (f); *People v. Gardeley*, *supra*, at pp. 610, 616.) Like all other elements of a criminal offense, the gang enhancement allegations must be proved beyond a reasonable doubt. (*People v. Nelson* (1978) 85 Cal.App.3d 99, 103.)

Anderson argues correctly that the finding that his crime was gang-related—was perpetrated for the benefit of, at the direction of, or in association with a criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members—cannot rest solely on evidence of his criminal history and gang affiliation. But here, there is more. There is evidence (the sufficiency of which Anderson does not dispute) that Anderson and Hill were members of the Carver Park Compton Crips (CPC or CPCC) gang. There was evidence that they were together in

16

CPCC territory when they confronted McDaniel about her youth, and they were in turn confronted by McDaniel's self-identification as having a Black P-Stone Blood (BPS Blood) gang affiliation,[17] and were threatened by McDaniel with a knife or knives. There was evidence that Anderson sought a gun from Hill, and inferentially, that Hill—a member of Anderson's gang—supplied him with the gun he used to shoot McDaniel. And there was evidence that Anderson then pursued McDaniel and Smallwood, shooting McDaniel at close range. Finally, there was evidence that the conduct attributed to Anderson and Hill was of benefit to their gang, "by letting people know that they're violent, letting people or letting the victim know they're not going to be disrespected by a Blood gang member in their turf."

The jury was free to conclude that Anderson's retaliation had nothing at all to do with Anderson's and Hill's gang affiliations, or the rivalry of their gang with the gang-affiliation claimed by McDaniel. It could have disbelieved the expert testimony that it is typical of gang culture for a member to look to other members when a gun is needed, that Anderson's request to "get the gun cuz" or "get the burner cuz" was not a gang-related reference specific to Crips gangs (as the gang expert testified it was, and as Smallwood testified she understood it), and that Anderson's acquisition of the gun did not result from his request and association with other present gang members. It could have concluded that the incident arose solely from his confrontation by McDaniel, a much younger female, without any thought of retaliation for her claim of rival gang affiliation, without any concern that he was being disrespected in front of members of his own gang and other witnesses, without any gang-related influence on his behavior at all.

But the jury was not compelled to reject the evidence and reasonable inferences of gang involvement in the incident. It could reasonably find that Anderson had asked a fellow gang member to provide him with a gun, and that in response a gang member had handed him the gun with which he shot the victim. It could conclude that the murder was

---

[17] The expert testified that the Black P-Stone Bloods are not specific rivals with the Carver Park Compton Crips, but that the Crips and Bloods are general rivals.

17

committed for the benefit of and in association with Anderson's gang.  In sum, the jury found and we agree that there is sufficient evidence to support the gang enhancement.

## Conclusion

Anderson was deprived of competent counsel at the preliminary hearing.  Had he pursued and perfected relief before he was tried and convicted in a trial free from that defect, he would have been entitled to have the information set aside and to have a new information, preliminary hearing, and arraignment.  But that relief is no longer available without a showing that he was somehow prejudiced by the pretrial error, in a manner that his conviction following a full and fair trial did not cure—a showing that we believe would not be possible even if he had attempted it.

The primary disputed issue at trial was the accuracy of Anderson's identification by various witnesses as McDaniel's shooter.  Despite the various uncertainties and inconsistencies, however, those identifications provided substantial evidence to support the jury's determination on the issue.

The same reasoning requires our refusal to set aside the jury's determination that the special allegations charging that the murder for which Anderson was convicted was committed for the benefit of, at the direction of, or in association with a criminal street gang, with the specific intent to promote, further and assist in criminal conduct by gang members.  There was substantial evidence that Anderson was an admitted gang member, and that when taunted by McDaniel, a girl about half his age who expressed her affiliation with a rival gang, he obtained a gun from another gang member, pursued her when she walked away, and shot her close range—in order, a gang expert opined, to preserve the gang's reputation for violence and control in its home territory.  That evidence, apparently credited by the jury, is sufficient to support the jury's true finding on the special gang allegations.

18

**Disposition**

The judgment is affirmed.

CERTIFIED FOR PARTIAL PUBLICATION.


CHANEY, J.


We concur:


ROTHSCHILD, P. J.


BENDIX, J.*

---

* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.