Filed 5/7/15  P. v. Winters CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>CHALEN WINTERS,<br><br>    Defendant and Appellant. | D065472<br><br><br>(Super. Ct. No. FSB802535) |

APPEAL from a judgment of the Superior Court of San Bernardino County, Michael A. Smith, Judge. Reversed.


Jeffrey R. Lawrence for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Lynne G. McGinnis and Kristine A. Gutierrez, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Chalen Winters of first degree murder of Michael Lundin. (Pen. Code, § 187, subd. (a).)[1] The jury also found true an allegation Winters used a deadly weapon—a crowbar—in committing the murder. (§ 12022, subd. (b)(1).) In posttrial proceedings, the trial court denied Winters's motion for a new trial, but granted his request to reduce the verdict to second degree murder. The court sentenced Winters to a term of 15 years to life, with a one-year enhancement for using a deadly weapon.

Winters contends the record lacks substantial evidence to support a verdict of second degree murder. He claims the court erred in denying his motion for a new trial on grounds of instructional error, prosecutorial error and juror misconduct. Winters asserts he received ineffective assistance of counsel. Winters asks this court to take judicial notice of his trial attorney's State Bar disciplinary record, including the fact that after the trial the attorney entered into a stipulated disposition of pending disciplinary charges in another matter, resulting in his suspension from practicing law.

We conclude that Winters was denied effective assistance of counsel as a result of his trial attorney's failure to properly investigate the case, adequately prepare for trial and maintain contact with his client. In addition, there was no tactical reason to refuse the court's offer to instruct the jury on manslaughter based on theories of provocation and heat of passion when the court was instructing the jury on manslaughter based on a theory of imperfect defense of self or others. These deficiencies undermined the proper

---

[1] Unless otherwise specified, statutory references are to the Penal Code.

2

functioning of the adversarial process and were prejudicial to the defendant.  We reverse the judgment.[2]

## FACTUAL AND PROCEDURAL HISTORY

*Overview*

On June 17, 2008, animosity between two groups of young adults and teenagers, the "jocks" (also known as "the football players") and the "skaters," culminated in a violent confrontation between some members of each group.  During the brawl, 18-year-old Winters hit Lundin in the head with a crowbar, fracturing his skull.  Lundin collapsed and died from his injury.  He was 20 years old.

The People charged Winters with first degree murder.[3]  The court appointed the public defender to represent him, but he declared a conflict.  The case was then assigned to Byron E. Congdon, an independent contractor with the conflict panel.

Other than the preliminary hearing, there were no pretrial proceedings.  On March 7, 2011, Congdon told the court he was not ready for the evidentiary portion of the trial, but was willing to start selecting a jury.  Jury selection began on March 9 and concluded the following morning.  The trial began on March 14.

In her opening statement, the prosecutor told the jury the skaters planned to lure the football players to their location to attack them and set out all kinds of weapons in preparation for the ambush.  She said only three football players went to that location.

---

[2]    We therefore need not examine Winters's other claims on appeal.

[3]    The People initially filed a complaint charging Winters with voluntary manslaughter.

The defendant came up behind the victim and hit him over the head with a crowbar. The defense reserved its opening statement.

*The Evidence at Trial: Preliminary Events*

On June 17, 2008, a small group of skaters were at a park when several former high school football players arrived. The jocks demanded the skaters turn off the music they were playing, resulting in a verbal exchange. Later that evening, the two groups had an encounter outside a Denny's restaurant. Cody Leonard, a skater, confronted Martin Mosely, a jock, for harassing his girlfriend. With other members of each group standing by, including Winters, Leonard and Mosely fought until Leonard hit Mosely in the nose, which began bleeding profusely, and the others stopped the fight.

*The Events of June 18, 2008*

On June 18, a group of approximately 10 to 12 jocks were partying at the home of Nick Fey. They were drinking. A group of 11 or 12 skaters were partying at Mark Potts's house on Knickerbocker Road. They were drinking and some were doing drugs.

Shawn Sutherland, a former high school football player, was at Fey's house when he received a text message from a friend saying he and Mosely wanted help to "get back at" the skaters. Sutherland discussed the message with the football players at Fey's house. They wanted to retaliate for the fight the previous night. Sutherland left the party and went to Lundin's house. There, Sutherland received a telephone call from Christopher Day, a skater. Day asked if the football players were coming to Potts's house. Sutherland said he decided to fight because "I'm a male and I was a 19-year-old kid who backed up his friends." Before he left, Sutherland telephoned a friend who was

4

at Fey's house.  Sutherland expected more people would join the fight because "it was a good group of buddies, and that's just how it works."

When Sutherland arrived on Knickerbocker Road, he took off some of his clothes, set his cell phone down, and started walking toward the house.  He saw five skaters standing in front of the driveway.  He walked up to them, accompanied by Lundin and their friend, Tyler Babin.  Lundin was in the rear.  Sutherland testified he told Babin and Lundin, "Hey, watch the bushes.  I think there's people over there."

Sutherland said the skaters appeared to be getting ready for a fight.  One of the skaters blew a whistle and people came out from the bushes, over walls and from behind things.  They surrounded Sutherland, Babin and Lundin.  The skaters were holding two-by-four boards, tire irons, a crowbar and other wood and metal bars.  Sutherland heard a clunk.  He spun around.  Lundin had fallen.  Sutherland and Babin took off running.  Sutherland heard screaming and ran back to Lundin.  Two girls were talking to Lundin.  Everyone else had scattered.

Megan Lewis was at Fey's party.  She drove Babin and several others to Knickerbocker Road.  Sutherland and Lundin were waiting on the corner when they arrived.  There were three people standing in the road in front of Potts's house.  There was some arguing and pushing, and then someone blew a whistle.  Lewis could not tell where it came from.  A mob of people came forward.  Several of them had items in their hands and they started swinging.  Lewis saw Lundin fall.

Babin said he, Sutherland, and Lundin walked toward three people who were standing in front of the skaters' house.  Those three people did not have anything in their

5

hands. Babin heard a whistle. Someone yelled, "Come on out." Three men came out from a bush behind Lundin. More came out from behind a shed. They formed a half circle around him, Sutherland and Lundin. Someone approached Sutherland and hit him across his forearms. Babin turned around and saw Lundin get hit from behind. The swing was more horizontal than vertical.

Katheryn Haatvedt was at Fey's house when Sutherland called about a fight, "[s]o, in a big excited rush, we got in Megan's car to go to the fight." They had been drinking beer and hard liquor. Another car full of people was behind them by five or 10 minutes. Haatvedt saw a few blows being thrown, then 15 to 20 people came running out of the bushes at once. She saw Lundin on the ground. Lewis drove up the street to check on Lundin. Haatvedt recognized Winters. He looked like he was in shock.

David Ferguson was at the party at Potts's house on Knickerbocker Road. Everyone was drinking. Ferguson was very intoxicated. Someone at the house received a telephone call saying the jocks wanted a rematch. No one planned an ambush. They agreed to let everyone know when the jocks arrived. There were people fighting in the street and more jocks were arriving. Ferguson was hit in the head during the fight.

Ferguson denied telling the police the skaters had a "Trojan horse plan." He denied saying Winters held the crowbar with two hands and brought it down on Lundin's head. Ferguson said he was under the influence of drugs when interviewed by the police. He admitted he was currently on probation and had juvenile priors.

Homicide detective Rick Bessinger testified he interviewed Ferguson on June 19. Responding to leading questions by the prosecutor, Bessinger acknowledged Ferguson

had said the skaters were planning for the other group to arrive and had referred to their plan as "a Trojan horse plan." Bessinger testified that according to Ferguson, the people at the residence started collecting weapons while waiting for the football players to arrive. Bessinger said Ferguson said he saw Winters hit one of the three football players with a crowbar from overhead in a downward motion. The prosecutor asked, "And did he describe the hit as being, quote, 'bone-crushing?' " Bessinger replied, "Yes."

Dominique DeAngelis[4] testified the football players had been driving back and forth on Knickerbocker Road all day on June 18, threatening them. The football players would harass them at the park, at the restaurant, wherever they went. On June 18, Winters did not arrive at the house until after Day telephoned the football players and asked if they were coming to fight. Winters was moving his belongings into the house. He asked for help getting his mattress out of his truck.

Dominique said when he saw Sutherland, Babin and Lundin walking up the street, he, his niece Alyssia DeAngelis, and his nephew Tory DeAngelis went outside. Dominique did not hear a whistle. When the football players confronted them and it became obvious there would be a fight, Dominique yelled at the people in the house to come out. Babin and Tory started pushing each other. Sutherland or Babin threw the first punch. Tory and one of the jocks were fighting. Sutherland swung at Dominique and then he hit Tory. Someone hit Sutherland with a stick. Winters arrived as other cars with football players were driving up the street. At least five cars pulled up. One car was

---

4      To avoid confusion, we use the first names of individuals who share the same last name.

trying to run people over.  The driver tried to hit Day and almost ran over Lundin.

Dominique heard a smash, like a melon being crushed.  When Lundin fell, everything

stopped.  Winters was standing there with a crowbar.  He was holding it at the bent end.

Winters looked shocked.  Dominique told him to telephone for emergency assistance.

Dominque asked a girl to take Lundin to the hospital.  She said she did not want to get

blood in her car and sped away.

Alyssia testified the skaters did not make a plan to fight the jocks.  The previous

night they had heard the jocks wanted to kill them.  Everyone felt threatened.  Alyssia

said the jocks were trying to get them.  A number of cars drove by their house during the

day and stopped.  Some girls asked them to go to a party in the woods.  Alyssia later

realized they were the same girls who refused to take Lundin to the hospital.

When the jocks came to the house, Alyssia was sitting outside with her brother,

Tory, Winters and Winters's girlfriend by the camper shell next to the garage.  No one

was hiding.  When Alyssia saw the football players approaching, she went inside to tell

the three younger girls to stay in the house.  Alyssia came out of the house in time to see

Lundin on the ground and the crowd dispersing.  She went to help Lundin, who

responded to her request to squeeze her hand.  Sutherland was helping her.  Sutherland

stopped his friend from running her over with his car.  Had he not jumped in front of the

car, she and Lundin would have been hit.

Without objection, the prosecution played Alyssia's recorded interview with the

police to the jury.  In response to an officer's questions, Alyssia acknowledged her father

was on parole, her brother, Tory, had a juvenile record, and she had been arrested for

8

fighting when she was 15 years old. An officer told Alyssia she needed to understand "this is a murder investigation . . . and if we catch you lying . . . that makes you a part of this, hands down."

Alyssia told the officers she received a call from Potts's friend Zack on June 18, saying the jocks wanted to have a rematch. Everyone at the house agreed they were not leaving the house to fight. Everyone thought they were going to end up getting stabbed by the people that were coming. There were weapons everywhere for people to grab. Her uncle, Dominique, told her that if anything happened, such as someone pulling a knife, she could pick up something to help him if necessary. He showed her where there was some rebar and skateboard trucks.

When Alyssia went outside "some guys" were walking up the street and more were arriving. Winters and his girlfriend were by the camper shell by the garage. Alyssia said "everybody [was] hitting everybody." Winters came from the driveway, ran up behind the victim and started swinging like everybody else. Winters swung the crowbar like a bat, but up high. She heard a sound like someone hitting a watermelon and heard the victim fall.

Alyssia said it took a long time for emergency responders to arrive. She was on the ground holding Lundin's hand. She kept talking to him. For about 10 minutes he was doing fine. By the time the ambulance arrived, he was gone. A police officer explained the emergency call went to a different area because the callers' phones had different area codes. The local police never received a call.

9

Tory testified the skaters heard rumors the jocks were coming to their house to retaliate. None of the people at the house made a plan to attack the jocks. They came out of their house when they noticed the jocks were pulling up in their cars.

Detective Stan Wijhamer interviewed Tory after the incident. Without objection by the defense, the detective answered "yes" to a series of leading questions by the prosecutor concerning Tory's prior statements about preparations the skaters made to ambush the football players.

Michael Winger testified he was at Potts's house when a friend of his telephoned and said the jocks wanted a rematch. Nothing was set up. The jocks just walked up the street. The skaters did not have a plan to fight.

Potts testified the skaters did not have a plan to fight the jocks. They were partying. He was on acid. The jocks showed up at their house to fight them. More than 20 people were getting out of their cars. Potts testified the skaters knew the jocks were coming because the jocks had called and threatened them, and his friend Zack had telephoned and said they were coming. When the football players arrived, Potts was inside. He walked outside and saw a jock with a rock in his hand. That person hit Potts on the side of his head with the rock. Potts hit him back and they fought. A car tried to run him over.

Sergeant Jason Radeleff testified he was part of the investigative team that had interviewed Potts and Winger. Without objection, the prosecutor asked the sergeant:

> "[ADA:] Now, do you remember when Mr. Potts was describing how Chalen Winters hit Mr. Lundin with that crowbar, how he described that?

10

"[Radeleff:]  I don't recall, specifically, how he described it.

"[ADA:]  Do you recall him saying that he walked up behind Lundin and hit him in the back of the head with a crowbar?

"[Radeleff:]  Yes.

"[ADA:]  Holding the crowbar in both hands and swinging it straight down into Lundin's head?

"[Radeleff:]  Yes."

Without objection by the defense, Radeleff answered "yes" to a series of leading questions by the prosecutor about Winger's statements concerning the skaters' plan to ambush the football players.

The coroner testified that Lundin died from blunt head trauma, which would have caused death within 10 minutes.  Lundin had cocaine and hydrocodone in his system. Those drugs were not a factor in his death.

In an opening statement of less than a minute, the defense told the jury that it had already figured out what the case was about and had heard a lot of different versions about that night.  The jury would now hear "what was going on within the mind of Chalen Winters.  [¶] Because intent is a key element of this case."  Once the jury heard all the evidence, it would not find the defendant guilty of murder.

The defense called one witness, Brooke Peterson.  Winters testified on his own behalf.

Peterson testified there was a group of six men and six women at Potts's house on June 18. They were playing music and dancing, and drinking whiskey and beer. The football players kept telephoning them during the day. They said the entire football team was going to come over for a rematch. The jocks arrived in four or five cars. The football players were "pretty big guys." Someone said something and "it just went crazy from there." One of the football players hit one of her friends and then everyone started fighting. Cory Nelson was thrown on the ground and was getting beat up by someone who was bigger than he was. Ferguson was bleeding from a gash in his head. Peterson testified the football players gave a signal and all their friends came out. She believed Winters was protecting her and his friends. She was scared. She thought her life was in danger.

Peterson saw Lundin fall and ran over to him. Alyssia and Cheyenne Winters were with him. Winters looked completely shocked. He telephoned 911. When Lundin fell, the people around him stopped fighting. There was still some fighting taking place up the street. Peterson asked a girl who was driving a big SUV to take Lundin to the hospital. The girl said she did not want to get blood in her car. The girl started to drive up the street and then turned around and tried to run them over. Peterson had to jump in the bushes to keep from getting hit by the car. Later, Winters stayed by himself, crying. The next morning, they went to see an attorney and then turned themselves in to the police.

Winters testified he was moving his possessions to Potts's house on June 18. He had been staying there off and on for a month. There were 11 or 12 people at Potts's

12

house on June 18.  Winters heard that the football players wanted to have a rematch for Leonard's fight with Mosely.  The football players telephoned around 6:00 p.m. or 7:00 p.m. to say they were coming over but they did not arrive.  Winters did not hear Day telephone the football players.  Winters did not have any discussions with anyone about gathering weapons.  The house was like a dump.  There was stuff everywhere.  Winters was sitting on the camper shell when he saw at approximately 10:00 p.m. three people walking up the street toward his house.  He picked up a crowbar to discourage any fighting and walked to the street.  Winters was approximately eight feet away when three men walked by.  When he arrived at the street, there was "just a whole scuffle in front of [him]."  He saw Lundin's hand coming out of his pocket.  Winters said he had the thought "gun," took one step forward and hit Lundin.  He dropped the crowbar immediately after hitting Lundin.

Winters recognized Sutherland when Sutherland started running towards him.  He thought Sutherland was going to hit him and ducked, but Sutherland ran past him.  Winters turned and saw Lundin.  Winters was shocked.  He felt horrible.  Alyssia was with Lundin.  She asked Lewis to take him to the hospital.  Lewis said she did not want blood in her car and drove away.  Winters telephoned 911 and ran away.

Winters said he did not walk into the street with the intent to ambush the football players.  He did not intend to hit and kill Lundin.  He never hid in the bushes.  Winters had never been in a fight before.  He and his friends started drinking around 8:00 p.m.  Everyone was obviously drunk.  Winters acknowledged he did not tell any of his friends he thought Lundin had a gun.  He said he did not talk to anyone about the incident.

13

At the close of evidence, the trial court said there was evidence to support a finding of manslaughter under theories of sudden quarrel or heat of passion, and provocation, and proposed to instruct the jury accordingly. The defense informed the court that it wished to rely solely on the defense of self-defense and defense of others, and imperfect defense of self or others, and asked the court not to give those instructions. The court instructed the jury on first and second degree murder, and manslaughter based on a theory of imperfect defense of self or others.

The jury returned a verdict of first degree murder and found that the defendant personally used a deadly and dangerous weapon in the commission of the crime.

*Posttrial Proceedings*

After he was convicted, Winters retained the services of a different defense attorney and filed a motion for a new trial or to reduce the conviction to voluntary manslaughter. Winters argued the record lacked sufficient reliable evidence to support a verdict of first degree murder. He requested a new trial on grounds of prosecutorial error, juror misconduct and ineffective assistance of counsel.

At the hearing on the motion for a new trial, Steven Salazar testified he was the initial defense investigator on the case. He had never investigated a murder case before being assigned to Winters's case. At that time, he was not a licensed investigator. Salazar had a brief initial meeting with attorney Congdon. After that meeting, their interaction was "nonexistent." Congdon did not prepare any comprehensive investigation requests. Salazar received all his guidance from his fellow investigators. He also investigated the leads Shelly McKee, Winters's mother, gave to him.

14

Salazar interviewed Alyce DeAngelis, Alyssia's grandmother. Alyce worked at Denny's. She said Mosely left his cell phone on a table at Denny's after the fight on June 17. Alyce saw a text message on his phone that read, "We know who they are, we know where they live and hang out. We'll take care of them for you." Salazar spoke to the manager at Denny's, who saw the same text. Leonard's girlfriend told him the football players were known as bullies and troublemakers, and they frequently harassed her. There were many other steps Salazar wanted to take in the investigation. He also wanted to discuss his findings with Winters. However, under the conflict panel's funding guidelines, Salazar could not investigate further without approval from the attorneys. Congdon never returned Salazar's telephone calls or responded to e-mails. Salazar had no interaction whatsoever with Congdon.

Congdon testified he directed Salazar to interview every person who gave a statement to the police. Congdon believed he was adequately prepared for trial. He had no independent recollection why he had told the court he was not ready to begin the evidentiary portion of the trial but was willing to proceed with jury selection. Congdon agreed a defense attorney in a murder trial should have full command of the evidence before selecting the jury. He acknowledged he did not exercise any peremptory challenges.

Congdon received Salazar's reports by e-mail. He did not print the reports and they were not in his trial binder. His practice was to review the investigative reports when he received them. Congdon did not call witnesses with credibility problems. He determined the best defense was self-defense, unreasonable self-defense or defense of

15

others.  Congdon did not recall if he had any of the recorded police interviews of key witnesses transcribed.  He acknowledged he did not impeach Sutherland, who had initially lied to the police.  Congdon acknowledged Haatvedt had lied to the police and made inconsistent statements at trial, and he did not challenge her testimony with those statements.  Congdon did not impeach Lewis when she testified the football players did not give any items to her when they arrived.  She had told police that when she arrived at the scene, the football players handed her their keys and wallets.  Congdon acknowledged he did not use Fey's statement that at least 12 people left his house to go to the fight.

Congdon testified he did not give an opening statement at the start of the trial because he did not want to have credibility problems with the jury if Winters did not testify.  He acknowledged he did not tell the jury in his opening statement that Winters was acting in self-defense.  Congdon did not object to the admission of Alyssia's interview with the police because it was a prior consistent statement.  He did not object to the officers' statements concerning the statements the witnesses had made to the police.  Congdon wanted to convey to the jury Winters had nothing to hide.

Congdon said he was disciplined by the California State Bar in September 2008 for not performing legal services with competence, not keeping a client informed of significant developments and not cooperating with a State Bar investigation.

McKee testified Winters was in custody for almost three years before the case went to trial.  McKee had a record of her son's 911 call on her telephone bill.  She obtained letters attesting to Winters's good character.  McKee offered the phone records and the letters to Congdon.  At that time, he said he did not want them.  Before trial,

16

McKee again offered the records and letters to Congdon. He would not take them. He did not call her to testify.

Alyce said she came to the trial to talk to Congdon. He said he had read her statement and it did not matter. Alyce told him her testimony did matter because it proved the skaters were being attacked. Congdon did not call her to testify.

Winters testified he asked Congdon for a copy of the discovery at least three times. He did not receive any materials. He was never given a copy of Salazar's reports and did not have the opportunity to discuss the results of the investigation with anyone. Congdon contacted Winters twice, once for an hour before the preliminary hearing and once before trial. Winters had limited information about the case and relied on his attorney's advice. Winters had not known there were witnesses who would testify there was some type of plan to attack the jocks. He would have been more likely to accept a plea offer had Congdon told him he could be convicted of murder even if he did not intend to kill Lundin.

At their first meeting, Winters told Salazar he thought Lundin had a gun. He assumed his attorney knew about his statement from discussing the case with the investigator. Winters did not discuss the facts of the case with Congdon before trial. Instead, Congdon explained imperfect self-defense and defense of others to him. The first time Winters had the opportunity to look at the discovery was during trial. He did not understand the elements of first and second degree murder and voluntary manslaughter until after the trial.

The court denied the motion for a new trial. The court found there was not sufficient evidence to support a verdict of first degree murder and reduced the conviction to second degree murder.

DISCUSSION

A

*INEFFECTIVE ASSISTANCE OF COUNSEL*

The Sixth Amendment of the United States Constitution and article I, section 15, of the California Constitution guarantee a criminal defendant a right to the assistance of counsel. This right encompasses the right to effective assistance of counsel. (*Powell v. Alabama* (1932) 287 U.S. 45, 68; *People v. Ledesma* (1987) 43 Cal.3d 171, 215 (*Ledesma*).) The benchmark for judging any claim of ineffectiveness is whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result. (*Strickland v. Washington* (1984) 466 U.S. 668, 686 (*Strickland*).)

To establish ineffective assistance of counsel, a defendant must show that counsel's representation fell below an objective standard of reasonableness under prevailing professional norms and that counsel's deficient performance was prejudicial. (*Strickland, supra*, 466 U.S. at p. 688; *Ledesma, supra*, 43 Cal.3d at p. 216.) To establish prejudice, the defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. (*Strickland,* at p. 694; *Ledesma,* at pp. 217-218.) A reasonable probability is a probability sufficient to undermine confidence in the outcome. (*Strickland,* at p. 694.)

18

In determining whether counsel's performance was deficient, we exercise deferential scrutiny. (*Strickland, supra,* 466 U.S. at p. 689; *Ledesma, supra*, 43 Cal.3d at p. 216.) There is a strong presumption counsel's conduct falls within the wide range of professional assistance. (*People v. Stanley* (2006) 39 Cal.4th 913, 954.) However, in cases in which an attorney has been disciplined for conduct that demonstrated his or her lack of competence in representing a client, the record of State Bar discipline creates a rebuttable presumption the attorney was not competent to represent a client in another matter. (*People v. Anderson* (2015) 234 Cal.App.4th 1411, 1417.)

B

*MOTION FOR JUDICIAL NOTICE*

"Ordinarily, accusations of incompetency cannot be used to subject counsel to open-ended inquiries about counsel's entire career." (*In re Vargas* (2000) 83 Cal.App.4th 1125, 1134.) Each case must be examined according to its own facts. (*Strickland v. Washington*, *supra*, 466 U.S. at p. 690.) "Any evidence of prior neglect must have a bearing on the new accusations." *(In re Vargas*, at p. 1134.) Here, Congdon stipulated he failed to respond promptly to a client and keep her reasonably informed of significant developments in her case from June to December 2009, during which time he was also representing Winters. Winters makes a similar claim which is supported by the record. We therefore grant his request for judicial notice of Congdon's record of State Bar discipline.

Congdon is currently not eligible to practice law. (The State Bar of California, <http://members.calbar.ca.gov/fal/Member/Detail/123286>, as of May 5, 2015.) The

record shows that in January 2012, Congdon stipulated to failing to respond promptly to reasonable status inquiries of a client in a matter in which he had agreed to provide legal services, in willful violation of Business and Professions Code section 6068, subdivision (m). He stipulated to failing to keep his client reasonably informed of significant developments. (Bus. & Prof. Code, § 6068, subd. (m).) Congdon also stipulated to having engaged in the unauthorized practice of law in September 2011, in violation of Business and Professions Code sections 6125, 6126, subdivision (a), and 6068, subdivision (a). Congdon did not provide the State Bar with proof of his rehabilitation, fitness to practice law, learning and ability in the general law, and his probation was revoked by order of the California Supreme Court in January 2014. (Congdon on Discipline, In the Supreme Court of California, S200695, Jan. 14, 2014.) Congdon's record of discipline creates a rebuttable presumption he was not competent to represent Winters. (*People v. Anderson*, *supra*, 234 Cal.App.4th 1411, 1417.)

C

*COUNSEL'S REPRESENTATION WAS INEFFECTIVE*

1.    *Duty To Investigate the Case and Prepare for Trial*

Winters contends Congdon did not adequately investigate, prepare and present the case for trial. " 'Criminal defense counsel has the duty to investigate carefully all defenses of fact and of law that may be available to the defendant.' (*In re Hill* (2011) 198 Cal.App.4th 1008, 1016; see *Ledesma*, *supra*, 43 Cal.3d at p. 222 ['[c]ounsel's first duty is to investigate the facts of his client's case and to research the law applicable to those facts'].)" (*In re Brown* (2013) 218 Cal.App.4th 1216, 1223.)

20

The record shows Congdon did not adequately guide and supervise an unlicensed, inexperienced investigator, authorize the investigator to take additional steps in the investigation, include investigative reports in his trial binder or transcribe any of the police recordings of witness interviews. By his own admission, Congdon told his investigator to interview only those persons who had been interviewed by the police. He did not respond to his investigator's requests for additional resources. Almost three years after he was appointed to represent Winters, Congdon told the trial court that he was not prepared for the evidentiary portion of the trial but would proceed with jury selection.[5] He acknowledged that under prevailing professional norms, a defense attorney should not select a jury unless he or she has full command of the evidence, especially where a client is facing a possible life sentence. In addition, in view of Congdon's statement he was not ready for trial, we draw the reasonable inference Congdon provided ineffective assistance of counsel when he did not inform the jury in his opening statement that Winters had acted in self-defense and in defense of others.

2.      *Duty to Inform Client*

An attorney has the duty "[t]o respond promptly to reasonable status inquiries of clients and to keep clients reasonably informed of significant developments in matters

---

5      Winters contends trial counsel's performance during jury selection was ineffective. However, he did not provide a record transcript of the jury selection. "It is the duty of an appellant to provide an adequate record to the court establishing error. Failure to provide an adequate record on an issue requires that the issue be resolved against appellant." (*Barak v. Quisenberry Law Firm* (2006) 135 Cal.App.4th 654, 660.) By failing to provide an adequate record, appellant cannot meet his burden to show error. (*Hotels Nevada, LLC v. L.A. Pacific Center, Inc.* (2012) 203 Cal.App.4th 336, 348.)

with regard to which the attorney has agreed to provide legal services." (Bus. & Prof. Code, § 6068, subd. (m); *Rose v. State Bar* (1989) 49 Cal.3d 646, 653, fn. 6.) Congdon stipulated to violating these duties during the same time period in which he was also representing Winters.

The record shows that Congdon did not respond to Winters's requests for a copy of his discovery before trial. Winters contends this was prejudicial because he was not aware of all the relevant evidence against him prior to trial and thus could not make an informed decision about the plea offer[6] or assist in his own defense. Congdon acknowledged he did not provide a copy of the discovery to his client. When retained counsel provided the discovery to Winters, Winters made more than 12 pages of notes on the material. Winters was not given the opportunity to discuss the facts of the case with either his attorney prior to trial or with the investigator during his investigation. On this record, respondent does not rebut the presumption that Congdon violated his duty to keep his client informed of significant developments in his case and his representation was therefore ineffective. (*People v. Anderson, supra,* 234 Cal.App.4th 1411, 1417.)

---

6       Winters claims he received ineffective assistance of counsel because his trial attorney did not effectively communicate or advise him on a plea offer. The minute order of December 10, 2009, shows that an offer was placed on the record and that Winters rejected the offer. Winters asserts Congdon did not explain the difference between a determinate and indeterminate sentence and the possibility he could be convicted of murder on a theory of lying in wait.
       In support of his argument, Winters relies on the "transcript of the proceedings before Judge Dest" on December 10, 2009. Appellant did not provide this court with a record transcript of the December 9, 2009, hearing. By failing to provide an adequate record, appellant cannot meet his burden to show error. (*Hotels Nevada, LLC v. L.A. Pacific Center, Inc., supra,* 203 Cal.App.4th at p. 348.)

3.     *Tactical Errors*

Winters contends his trial attorney made a number of tactical errors at trial, including rejecting the court's offer to instruct the jury on manslaughter, on theories of provocation, and heat of passion or sudden quarrel. In addition, he contends counsel's performance was deficient because he did not object to inadmissible evidence, impeach witnesses with their prior inconsistent statements, call witnesses favorable to the defense, corroborate defendant's 911 call, give adequate opening and closing arguments, and make a motion to dismiss charges under section 1118.1.

Tactical errors are generally not considered reversible, and counsel's decisions are evaluated in the context of the facts. (*People v. Stanley*, *supra*, 39 Cal.4th at p. 954.) Generally, we will reverse on the ground of inadequate assistance on appeal only if the record affirmatively discloses no rational tactical purpose for counsel's act or omission. (*People v. Montoya* (2007) 149 Cal.App.4th 1139, 1146.) However, "[a]n attorney's exercise of discretion in making tactical decisions regarding trial strategy must be both reasonable and informed. An informed decision is one made on the basis of reasonable investigation. (*Ledesma*, *supra*, 43 Cal.3d at p. 215.) Although counsel has 'wide latitude and discretion . . . that discretion must be a reasonable and informed one in the light of the facts and options reasonably apparent to counsel at the time of trial, and *founded upon reasonable investigation* and preparation.' [Citations.] '[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional

23

judgments support the limitations on investigation.' " (*In re Visciotti* (1996) 14 Cal.4th 325, 348; see *Woodford v. Visciotti* (2002) 537 U.S. 19, 22-24.)

We agree with defendant's argument there was no tactical reason for counsel to have rejected the trial court's proposed jury instruction on manslaughter on theories of provocation, and heat of passion or sudden quarrel. The court was instructing the jury on manslaughter based on imperfect defense of self or others; therefore, this was not a case in which defense counsel wanted the jury to have no choice but to convict the defendant of murder or to acquit. Unreasonable self-defense, heat of passion or sudden quarrel, and provocation "reduce an intentional, unlawful killing from murder to voluntary manslaughter by *negating the element of malice* that *otherwise inheres* in such a homicide." (*People v. Breverman* (1998) 19 Cal.4th 142, 154.) The trial court informed Congdon there was evidence to support a finding of manslaughter under theories of sudden quarrel or heat of passion, and provocation. Counsel was ineffective when he refused to allow the jury to consider alternative theories of manslaughter.

With respect to the claims counsel was ineffective because he did not object to inadmissible evidence, impeach witnesses with their prior inconsistent statements, or call witnesses favorable to the defense, the record shows these were strategic choices made after less than complete investigation. (*In re Visciotti, supra*, 14 Cal.4th at p. 348.) Salazar testified there were other investigative steps he and his colleagues believed necessary, but Congdon never returned his calls or responded to his e-mails, and he was unable to secure authorization for additional investigation. Competent counsel would have challenged the use of out-of-court statements, particularly those obtained under

24

threat of prosecution and without *Miranda*[7] advisements. Competent counsel would have sought to exclude otherwise inadmissible statements from evidence, such as Alyssia's statements concerning her father's criminal history, her brother's juvenile and mental health history, and her own contact with police as a juvenile. Competent counsel would have impeached prosecution witnesses with their prior inconsistent statements and false statements to the police, and presented witnesses who would have testified favorably to the defense. The People do not rebut the presumption of incompetence. We therefore turn to a consideration of whether counsel's ineffective assistance was prejudicial to the defendant.

D

*COUNSEL'S CONDUCT WAS PREJUDICIAL TO DEFENDANT*

To establish prejudice, the defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. (*Strickland*, *supra*, 466 U.S. at p. 694; *Ledesma*, *supra*, 43 Cal.3d at pp. 217-218.) A reasonable probability is a probability sufficient to undermine confidence in the outcome. (*Strickland*, at p. 694.) We conclude that Winters has met this burden.

Counsel's lack of reasonable investigation and preparation for trial, his failure to keep the defendant informed of the developments in the case and his suspension from the

---

7    *Miranda v. Arizona* (1966) 384 U.S. 436, 466 [without protections flowing from adequate warning and the right to counsel, all safeguards for giving of testimony, whether by the accused or *by any other witness*, become empty formalities].

25

State Bar for violating similar duties to another client are sufficient to undermine confidence in the outcome of the trial. (*Strickland*, *supra*, 466 U.S. at pp. 694, 686 [counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result].) The evidence supporting a verdict of first or second degree murder is not so overwhelming as to leave no doubt as to the defendant's guilt. (Cf. *People v. Doolin* (2009) 45 Cal.4th 390, 432 [extensive evidence of defendant's guilt demonstrates there is no reasonable probability of a more favorable outcome].)

There is evidence in the record to support a finding the football players instigated the altercation on Knickerbocker Road after threatening and harassing the skaters. Counsel allowed the prosecution to show the skaters, generally, in a very unfavorable light. He made no effort to impeach the testimony of several primary "jock" witnesses even though he had, or should have had, material in his possession showing they initially had lied to the police and/or had made prior inconsistent statements. Counsel failed to call witnesses who were not involved in the altercation and would have corroborated the skaters' testimony the football players were planning to retaliate, thereby casting doubt on the argument the jocks were lured into an ambush. There is a lack of evidence to show Winters colluded with others, or was aware of any plan, to lure the football players to the house to ambush them. Eyewitnesses reported seeing Winters swing the crowbar while

holding it at its bent end by one hand, which the coroner's report tends to corroborate,[8] and not, as the prosecutor emphasized by asking leading questions of police witnesses and in closing argument, by bringing the crowbar down full force on top of the victim's head with both hands, which carries with it an implication of malice. Counsel's failure to transcribe reports of police interviews of prosecution witnesses impeded his ability to examine and challenge the police officers' testimony, which in large part consisted of "yes" responses to the prosecutor's leading questions. Congdon testified it was his intent to humanize Winters by emphasizing his 911 call. However, he did not introduce in evidence the recording of Winters's 911 call, which the prosecution had provided to the defense. This failure allowed the prosecutor to question Winters's credibility during closing argument by asserting there was no showing he had telephoned for emergency assistance. Significantly, counsel's decision to reject the trial court's proposed instructions on voluntary manslaughter prevented the jury from considering whether the defendant had acted in heat of passion or in response to provocation or sudden quarrel. Had counsel's performance been adequate, a jury could have reached another result.

We conclude that counsel's conduct "so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." (*Strickland*, *supra*, 466 U.S. at p. 686.) There is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.

---

8    According to the coroner's report, the location of the three and a half inch fatal linear wound was on the back of Lundin's head, from approximately the level of the middle of the left ear to a quarter inch above the right ear.

27

(*Id.* at p. 694; *Ledesma, supra*, 43 Cal.3d at pp. 217-218.) We therefore reverse the judgment.

## DISPOSITION

The judgment is reversed.


NARES, J.

WE CONCUR:


HUFFMAN, Acting P. J.


McDONALD, J.