Filed 8/3/17 (unmodified opinion attached)

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D069355 |
| Plaintiff and Respondent, | (Super. Ct. No. SCD252523) |
| v. | ORDER MODIFYING OPINION AND DENYING PETITION FOR REHEARING |
| ANTWAREN LAMONT ROBERTS, | |
| Defendant and Appellant. | [NO CHANGE IN JUDGMENT] |

THE COURT:

It is ordered that the opinion filed herein on July 18, 2017, be modified as follows:

On page 35, footnote 21 is removed and replaced with the following:

"The 2004 intake interview apparently arose after Roberts was arrested because law enforcement officers had intervened in a verbal altercation between Roberts and an unidentified man.  Roberts gave officers a false name and fled.  In the ensuing chase, one officer suffered injuries including a broken wrist.  Roberts was ultimately charged with resisting an officer (Pen. Code, § 148, subd. (a)) and giving false information to an officer (*id.*, § 148.9, subd. (a)).  The record does not reveal the factual circumstances leading to the 2006 arrest and intake interview, but only reflects that Roberts was ultimately charged with resisting an officer (*id.*, § 148, subd. (a)) and injuring or tampering with a vehicle or its contents (Veh. Code, § 10852)."

**There is no change in the judgment.**

The petition for rehearing is denied.

McCONNELL, P. J.

Copies to:  All parties

CERTIFIED FOR PARTIAL PUBLICATION[*]

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>ANTWAREN LAMONT ROBERTS,<br><br>Defendant and Appellant. | D069355<br><br><br><br>(Super. Ct. No. SCD252523) |

APPEAL from a judgment of the Superior Court of San Diego County, Lorna Alksne, Judge. Affirmed in part, reversed in part, and remanded with instructions.

Patrick Morgan Ford for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Barry Carlton and James H. Flaherty III, Deputy Attorneys General, for Plaintiff and Respondent.

---

[*] Pursuant to California Rules of Court, rule 8.1110, this opinion is certified for publication with the exception of parts II.A. through II.C. of the Discussion.

A jury convicted defendant Antwaren Lamont Roberts of attempted murder and related offenses arising out of an incident in which he shot Krystal Sharkey with a handgun. It also found that Roberts committed the crimes for the benefit of a criminal street gang within the meaning of section 186.22 of the Penal Code.[1] In the published portion of this opinion, we address Roberts's contention that the California Supreme Court's recent decision in *People v. Elizalde* (2015) 61 Cal.4th 523 (*Elizalde*) precludes the admission of certain un-*Mirandized*[2] statements Roberts made during custodial booking interviews in which he admitted gang membership. Although these interviews occurred years before the crimes with which Roberts is now charged, when he was under arrest for other crimes, we conclude that a *Miranda* violation does not evaporate with the passage of time such that the statements become cleansed and admissible as to future misdeeds. Accordingly, we reverse the jury's findings as to the gang enhancement. In all other respects we affirm the judgment after addressing Roberts's additional contentions in the unpublished portion of the opinion.

I

FACTUAL AND PROCEDURAL BACKGROUND

Roberts was convicted of attempted murder in violation of sections 664 and 187, assault with a semiautomatic firearm in violation of section 245, subdivision (b), and possession of a firearm by a felon in violation of section 29800, subdivision (a)(1). As to

---

[1]     All further statutory references are to the Penal Code unless otherwise noted.

[2]     See *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).

3

all three counts, the jury found true the allegations that Roberts committed the crime with the intent to promote, further or assist in criminal conduct by gang members, within the meaning of section 186.22, subdivision (b)(1). The jury found his commission of the attempted murder was willful, deliberate, and premeditated within the meaning of section 189, and that he used a firearm, proximately causing great bodily injury to the victim, within the meaning of section 12022.53, subdivision (d). The jury also found Roberts personally used a firearm within the meaning of section 12022.5, subdivision (a), and personally inflicted great bodily harm upon the victim within the meaning of section 12022.7, subdivision (a), in connection with the assault with a semiautomatic firearm. The trial court sentenced Roberts to a determinate term of five years in state prison and a consecutive term of 40 years to life.

A. *The Shooting*

Sharkey, who had ties to the West Coast Crips (WCC) street gang, was playing dice in downtown San Diego when Roberts, known as "Scrappy," shot her twice in the chest. In addition to Sharkey's trial identification of Roberts as the shooter, Sharkey also told a police officer immediately after the shooting (while at a hospital prior to surgery) that "Scrappy" shot her.

Laticia Nelson was standing with the group of dice players when Sharkey arrived and joined the dice game. Nelson testified Roberts approached the group of dice players and stood with the group for a while. Roberts, who Nelson knew but not very well, briefly spoke to Nelson and then pulled a gun from his pocket and shot Sharkey. In addition to her trial identification of Roberts as the shooter, Nelson was shown some

4

photographs by a police officer within an hour after the shooting and identified Roberts's photograph, telling the officer she was 100 percent sure Roberts was the shooter.[3]

A third witness saw Roberts run from the scene just after the shooting and jump into a white car or truck. A fourth witness, a security guard, could not identify the shooter but saw a black male flee from the scene and get into a white pickup truck.

B. *The Alleged Motive*

One month before Sharkey was shot, police were investigating the murder of Chyrene Borgen. Roberts and Borgen had been involved in a romantic relationship that Borgen was working to terminate. Sharkey, a friend of Borgen's, believed Roberts was involved with Borgen's murder.

Sharkey was at Borgen's residence on November 1, 2013, when police arrived to notify Borgen's family of her death. At that time Sharkey met Detective Lee Norton, the investigating detective. Norton worked to foster trust with Sharkey, and about 10 days later Sharkey "reached out" to police with information about Borgen's murder

During that same time frame, Sharkey encountered Roberts at a memorial for Borgen. Roberts warned Sharkey that two other WCC members were out to get her. However, Sharkey had a developing suspicion Roberts was involved in Borgen's murder

---

3      A nearby security guard, Leroy Bontrager, testified he heard shots fired and then saw a fleeing man get into a white pickup truck and drive away. The man was tucking something into his waistband as he fled. Another percipient witness, Janet Scott, told police she had seen Sharkey and "Scrappy" with the dice players. She was around the corner from the dice players when she heard two or three shots. Scott then saw Roberts running around the corner, with his hands in his pockets, and jump into a white car or truck, which then drove away.

5

and told Borgen's sister of her suspicion. A few days before Borgen's funeral, Sharkey again encountered Roberts. Roberts angrily told Sharkey he had heard that Sharkey had accused him of being the last person to see Borgen alive. Sharkey claimed that Roberts pointed a gun at her face and said something to the effect of, "[k]eep my name out of your mouth." Roberts's act of pointing the gun at her infuriated Sharkey, who felt extremely disrespected by the act.

Sharkey subsequently saw Roberts at Borgen's funeral on November 18, 2013. Sharkey stared at Roberts during the funeral, and Roberts angrily returned the stare, mouthing the words, "I'm going to kill you." This further infuriated Sharkey, who again perceived Roberts's actions as disrespectful.

On learning that Roberts would be at a kind of wake attended primarily by WCC members, Sharkey decided to go and confront him about his threats to her. When Roberts came in and began laughing and socializing, Sharkey walked up and hit him in the face with a chain. Roberts was enraged. He pulled out a gun and told Sharkey he was going to kill her, and he ultimately left without further incident.

Sharkey believed Roberts would seek revenge. "[H]e wanted his get back from me hitting him with that chain." Sharkey was shot approximately two weeks later.

C. *The Gang Evidence*

The prosecution's gang expert on the WCC, San Diego Police Department Detective Juan Cisneros, had never heard of Roberts being a member or associate in WCC prior to Borgen's murder, but nevertheless opined Roberts was a member of the

6

WCC gang.[4]  Cisneros apparently based his opinion on several indicia.  First, after a defense in limine motion was overruled, Cisneros testified that Roberts admitted his association with WCC during jailhouse intake interviews in 2004 and 2006.  Second, Cisneros noted several photographs depicting Roberts in the company of gang members.  Third, Cisneros observed that Roberts had a nickname.  Finally, Cisneros relied on the fact that, while in jail in February 2014, Roberts participated with another alleged WCC member in assaulting a fellow inmate (also an alleged WCC member) for whom Cisneros testified a "green light . . . to be assaulted" had allegedly been authorized.

Cisneros also testified that if a WCC member were disrespected in front of other WCC members, the disrespected and humiliated member would have no choice but to retaliate violently, because failure to retaliate would equate to a complete loss of respect and status in the gang and could also lead to rival gang members targeting the disrespected gang member.  Given a hypothetical composed of facts mirroring the evidence elicited in this case (including the snitching and chain assault), Cisneros opined the disrespected gang member's act of shooting the person who had disrespected him would benefit the WCC gang.

---

[4]      Cisneros also testified as to the history and structure of the WCC, and discussed the importance to criminal street gangs of, among other things, respect, violence, retaliation, fear, snitching, initiation, monikers, and hand signs.  He testified that WCC's primary activities include murder, attempted murder, robbery, narcotics sales, and witness intimidation, and provided information as to the three predicate crimes.

D. *The Defense*

The defense maintained Roberts wasn't present at the shooting. Although a witness saw Roberts riding the trolley in the vicinity of the shooting around 6:00 p.m. on the night of the shooting, and the shooting occurred about 6:15 p.m., Raheem Jackson (who had known Roberts for about 20 years and thought of him as a "nephew") testified Roberts was at Jackson's house some distance from the shooting site for about two hours, from about 5:00 p.m. to 7:00 p.m. Jackson also testified that Roberts then used Jackson's cell phone to call for a ride, and cell phone records confirmed Jackson's phone was used to call Dwayne Shepard, a pastor, at 7:19 p.m. Pastor Shepard then picked up Roberts at Jackson's house and they went to the movies.

The defense portrayed Sharkey as a vengeful person. She claimed Roberts had tried to rape her 13 years earlier, and she wanted police to go after Roberts for the murder of Borgen. The defense theory of the case was that once Sharkey told police Roberts shot her, they never considered the possibility of other suspects. Defense counsel also argued that even if Roberts was the shooter, the shooting involved an incident of personal revenge rather than being gang related.

II

DISCUSSION

A. *Alleged Witness Intimidation*

Roberts contends he was denied a fair trial because a witness who may have provided Roberts with helpful evidence was purportedly intimidated by police into leaving the courthouse before the defense could call him as a witness.

8

During trial testimony, the defense sought to impeach Sharkey with a document (an alleged posting she made on her Facebook page in a "conversation" between herself and an unidentified third person) in which she supposedly conceded she did not know who "did it." The prosecutor objected, arguing the document should be excluded because it was undated, was merely a snippet and therefore lacked context, and the name of the third person to the conversation had been blocked out. The court excluded the document for lack of foundation and also noted the comments discussed may have been taken out of context.

Nine days later, as the defense was about to rest, defense counsel (Pamela Lacher) informed the court there was a person in the courtroom who might be the third person to that conversation, and the court recessed the proceedings to allow the defense to interview him and determine whether he wished to testify. Lacher subsequently informed the court she had given the witness "the option, and he declined to testify," and the court noted the witness was not "under subpoena [and] was free to go. . . ."

After a brief presentation by the prosecution of rebuttal witnesses, Lacher stated she "wanted to put something on the record" concerning the witness who departed. Lacher claimed that person, who might have been the third person to the Facebook conversation, spoke with the defense and prosecution in the hallway before he left. The witness later contacted Lacher and stated he had gone into the bathroom but was followed by law enforcement officers who surrounded him, tapped him on the shoulder while he was urinating, and spoke to him. The witness claimed he felt threatened by the officers in the bathroom, who purportedly called him a liar and said they would arrest him if he

9

testified. They also purportedly photographed him and completed an "FI," which they told him they could do since he was in public. As a result, he left the courthouse.

Roberts argues his Sixth Amendment rights were violated because the state interfered with the exercise of that right by law enforcement's intimidation of a potential witness. (*People v. Warren* (1984) 161 Cal.App.3d 961, 971-976.) He relies on *In re Martin* (1987) 44 Cal.3d 1. There, a favorable defense witness was arrested (after he testified for the defense) in the presence of three other defense witnesses, which intimidated those subpoenaed witnesses into refusing to provide material testimony for the defense. (*Id.* at pp. 28, 35.) The court found this amounted to prosecutorial interference with the defendant's constitutional right to present the testimony of witnesses at trial, and ordered that the defendant be given a new trial. (*Id.* at pp. 36-56.) Roberts contends those authorities control and entitle him to a new trial here.

To the contrary, however, we agree with the Attorney General that Roberts's claim cannot be resolved on appeal, but must instead be pursued (as in *In re Martin, supra,* 44 Cal.3d 1) in writ proceedings because the critical issues are (1) did police in fact intimidate the witness; (2) was the witness's election not to testify caused by such intimidation; and (3) would the witness have provided material testimony? (*Id.* at pp. 31-32.) None of those facts are determinable from the record on appeal. Because this appeal is "limited to the four corners of the [underlying] record on appeal" (*In re Carpenter* (1995) 9 Cal.4th 634, 646), while writ proceedings are not (*People v. Waidla* (2000) 22 Cal.4th 690, 703, fn. 1), Roberts's claim cannot be addressed in this appeal (*People v. Merriam* (1967) 66 Cal.2d 390, 396-397, disapproved on other grounds in *People v.*

10

*Rincon-Pineda* (1975) 14 Cal.3d 864, 882) but must be pursued, if at all, by way of a writ petition.

B. *Ineffective Assistance of Counsel*

Roberts contends he was denied effective counsel at his preliminary hearing because his attorney failed to conduct adequate discovery and use the facts the attorney would have found to obtain dismissal of the information at the preliminary hearing.

On December 3, 2013, two days after the shooting, the prosecution charged Roberts with the attempted murder of Sharkey. Because Roberts's retained attorney (Lacher) appeared on December 6, 2013, and he elected not to waive time, the preliminary hearing occurred on December 19 and 20, 2013. After hearing evidence, the court held Roberts to answer the charges.

Several months later, Roberts filed a motion to dismiss "the entire information." (Capitalization omitted.) The motion asserted that before the preliminary hearing, Lacher had asked the prosecutor handling the preliminary hearing for police reports related to the Borgen murder investigation, but the prosecutor purportedly refused because that investigation was ongoing and "was not relevant" to Roberts's attempted murder of Sharkey. Lacher claimed Roberts was denied his right to effective assistance of counsel because, had she seen the police reports regarding the ongoing Borgen murder investigation, she would have known that Sharkey had told police Sharkey suspected Roberts to have been involved in Borgen's murder. Thus, according to Lacher, she would have "been more prepared for the preliminary hearing" because she would have cross-examined Sharkey differently.

11

The prosecution opposed the motion, citing *People v. Gutierrez* (2013) 214 Cal.App.4th 343 and *Bridgeforth v. Superior Court* (2013) 214 Cal.App.4th 1074. It reasoned that a defense assertion of a discovery violation at the preliminary hearing stage required a showing that exculpatory evidence had been suppressed, that it was material, and that the defendant had suffered prejudice because of the violation. The prosecution argued that none of these factors had been established.

At the hearing on the motion to dismiss, Lacher argued the magistrate could only have found probable cause that Roberts was the shooter if it "believe[d] everything that Miss Sharkey sa[id.]" She asserted Roberts suffered prejudice from the late discovery because such information (i.e., Sharkey's suggestion to police of Roberts's involvement in Borgen's murder) would have permitted an argument Sharkey had an ulterior motive to identify Roberts as the shooter, and the magistrate as the fact finder at the preliminary hearing might have decided to disregard all of Sharkey's incriminating testimony that he was the shooter.

The trial court denied the motion to dismiss. It reasoned that Roberts suffered no prejudice because, given the low proof requirement at the preliminary hearing stage, there was no likelihood the result of the preliminary hearing would have been different if the additional impeachment evidence had been given to the defense because the evidence reasonably supported the conclusion Roberts was the shooter.

For two reasons we reject Roberts's effort to obtain reversal based on alleged errors in connection with his preliminary hearing. First, even assuming Roberts could show the preliminary hearing was somehow tainted by the prosecution's refusal to turn

12

over (or Lacher's failure to obtain) the evidence that Sharkey suspected Roberts was involved in Borgen's murder, Roberts learned the relevant facts before trial but did not pursue a pretrial writ petition seeking a new preliminary hearing. Accordingly, under *People v. Stewart* (2004) 33 Cal.4th 425, Roberts cannot obtain relief absent a showing he was denied a fair trial.

In *Stewart*, the defendant claimed his preliminary hearing was tainted by the prosecutor's failure to disclose evidence. (*People v. Stewart, supra,* 33 Cal.4th at pp. 461-462.) The Supreme Court explained that, if the defendant had presented such "irregularities" in a pretrial writ petition, the trial court could have dismissed and remanded for a new and properly conducted preliminary hearing. (*Id*. at p. 461.) However, because the *Stewart* defendant presented the issue for the first time on appeal, the Supreme Court held he was only entitled to relief if he could demonstrate " 'he was *deprived of a fair trial or otherwise suffered prejudice* as a result of the error at the preliminary examination.' " (*Id*. at p. 462.) The *Stewart* court, noting the defendant there made no "meaningful attempt to establish that he subsequently was deprived of a fair trial or otherwise suffered prejudice," rejected a claim that errors at a preliminary hearing entitle a defendant to reversal of a conviction at the subsequent trial. (*Ibid*.)

The same analysis holds true here: Roberts makes no effort to show that his resulting trial was unfair, or even that he suffered any prejudice at such trial, merely

13

because he did not obtain the discovery until after the preliminary hearing.[5]  Roberts makes no effort to explain why *Stewart* is not dispositive, and we therefore conclude he may not obtain reversal of his conviction on appeal based on any defects at the preliminary hearing.

Even assuming the failure to pursue writ relief does not foreclose his current claim, Roberts has failed to demonstrate he was denied effective assistance of counsel under *Strickland v. Washington* (1984) 466 U.S. 668 (*Strickland*).  Such a claim requires a showing (1) counsel's performance fell below an objective standard of reasonableness; and (2) defendant was prejudiced by the deficient performance.  (*Id.* at p. 687.)  On the first prong, when a defendant makes an ineffectiveness claim on appeal, "the appellate court must look to see if the record contains any explanation for the challenged aspects of representation."  (*People v. Babbitt* (1988) 45 Cal.3d 660, 707.)  If the record sheds no light on why counsel acted or failed to act in the manner challenged, unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation, the judgment is affirmed.  (*Ibid.*)

Roberts fails to identify exactly *what* Lacher did or did not do that caused her representation to fall below the standard of care of a reasonable attorney, much less that Lacher's unidentified acts or omissions fell below an objective standard of

---

5      To the contrary, Roberts did obtain the necessary discovery before trial, and Sharkey's opinion that Roberts was involved in Borgen's murder (and indeed her general antipathy toward Roberts) was well established during the trial.  Sharkey's purported motive to frame Roberts for shooting her was presented to the jury, and therefore he suffered no prejudice *at trial* from the absence of the same information at the preliminary hearing.

reasonableness. While Roberts appears to suggest Lacher might have handled the preliminary hearing differently if she had obtained the police reports, Lacher did request those police reports from the prosecution, and Roberts does not suggest what more a reasonable attorney could or should have done. We conclude Roberts has failed to show Lacher's actions fell below an objective standard of reasonableness.[6]

Roberts also fails to satisfy the prejudice prong, i.e., "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Strickland, supra*, 466 U.S. at p. 694.) Even if Lacher had

---

[6] Apparently recognizing that Lacher's acts did not fall below an objective standard of reasonableness, Roberts relies on *People v. Anderson* (2015) 234 Cal.App.4th 1411, *In re Edward S.* (2009) 173 Cal.App.4th 387, and *Harris v. Superior Court* (2014) 225 Cal.App.4th 1129 to argue that an ineffective assistance claim is viable if outside factors deprive the defendant of a vigorous advocate. However, in *In re Edward S.* the court found the attorney provided ineffective assistance by failing to investigate exculpatory evidence, which counsel explained was not due to tactical reasons but was because he had a heavy caseload, his office lacked sufficient funding, and he feared for his job if he continued to push for additional resources. (*In re Edward S.,* at pp. 407-410.) When the conduct of an attorney is deficient, regardless of the excuses offered for such deficient performance, a defendant's right to effective assistance of counsel is violated, but no similar showing is made here. In *Harris*, the court found the defendant was deprived of effective assistance of counsel at the preliminary hearing because counsel had a conflict of interest in the case and the right to effective assistance of counsel includes the right to conflict-free counsel. (*Harris,* at pp. 1137-1138.) However, *Harris* granted the relief sought because the defendant timely sought review by a writ of mandate, and hence did not necessitate the analysis required by *Stewart*. Finally, in *Anderson* the defendant was represented at a preliminary hearing by a lawyer whose law license had been suspended as the result of disciplinary proceedings. Although the court concluded such evidence raised an inference the attorney was not competent to represent the defendant at the preliminary hearing, and such inference was unrebutted, the court affirmed the resulting conviction because the defendant's failure to timely seek writ relief precluded him from obtaining reversal of the resulting conviction "[i]n the absence of any showing of prejudice." (*Anderson,* at p. 1421.) *Anderson* supports, rather than undermines, our analysis here.

15

obtained the subject reports before the preliminary examination, we are unconvinced there was any reasonable probability the magistrate would have found that insufficient evidence had been presented to hold Roberts to answer the charges. In her preliminary hearing testimony, Sharkey testified he stood over her and shot her in the chest multiple times at point-blank range. Sharkey also testified she believed he had been involved in the killing of her close friend Borgen, and also made clear she vehemently disliked Roberts. Because Sharkey's antipathy toward Roberts (and any inference that such antipathy could create motive for Sharkey to fabricate her accusation against Roberts) was revealed at the preliminary hearing, but the court still held Roberts to answer in light of Sharkey's unequivocal identification of Roberts as the shooter, there is no reasonable probability the presence of the police file would have produced a more favorable result at the preliminary hearing.

C. *Failure to Timely Produce Discovery*

Roberts argues the prosecution engaged in misconduct because it provided him late discovery of certain evidence encompassed within the court's discovery order. He asserts such misconduct denied him a fair trial and requires reversal. He alternatively contends the court abused its discretion when it refused to instruct the jury as to the prosecution's purported discovery violations, and that the absence of this instruction was prejudicial error.

1. Background

Roberts focuses on late discovery of two items: a CD recording of an interview of Sharkey in connection with the Borgen murder investigation (the Sharkey CD), and

16

certain text messages from Sharkey's phone between Sharkey and her boyfriend (the text messages).

On February 3, 2014, Roberts filed a motion to compel discovery, including information regarding the Borgen murder investigation. After conducting an in camera review of law enforcement's investigative file for the Borgen murder, the court ordered the prosecution to turn over to the defense portions of the file, "the 40 pages of reports, the interviews with Ms. Sharkey." It appears one item encompassed by that order—a police report by Norton summarizing his November 13, 2013, interview with Sharkey in connection with the Borgen murder investigation—was turned over to the defense.

During the prosecution's case, Lacher cross-examined Sharkey and obtained her admission that she contacted police on or about November 13, 2013, (after Borgen's murder but before being shot herself) for the purpose of "urging" police to "look at [Roberts] as the shooter[.]" Sharkey conceded she had zero proof Roberts killed Borgen; rather, she "just fe[lt] like he killed her."

During an ensuing break, Lacher objected that the Sharkey CD, which contained the audio of Norton's November 13 interview of Sharkey, had just been obtained by the prosecution and turned over to the defense. The prosecutor responded that Norton's report, which had been given to the defense well in advance of the trial, openly referenced there was a CD containing the interview in which Sharkey talked about "her beliefs about the defendant shooting Chyrene." However, the prosecutor opined that Sharkey's opinion about Roberts's involvement in Borgen's death was "essentially a side issue." Responding to Lacher's objection about the absence of the Sharkey CD, the

17

prosecutor further represented to the trial court that she had just obtained the Sharkey CD the day before and had immediately turned it over to the defense.[7]  The prosecutor also noted she was not the prosecutor at the time of the discovery motion, but instead had been assigned to the case four months before trial, had "discussed things [with Lacher] that were outstanding" to assure the defense had the discovery to which they were entitled, and "as I'm becoming aware that [Lacher] needs things, I'm providing them" immediately.

Ultimately, after the prosecution stipulated the jury could listen to the audio of Sharkey's interview with Norton, the trial court ruled that because (1) the defense had cross-examined Sharkey about her beliefs as to Roberts's involvement in Borgen's murder, (2) the jury would be able to hear the audio of the interview, and (3) Sharkey's opinions regarding another, separate murder investigation were "not that relevant to this case," it would not grant a mistrial because the Sharkey CD had not been turned over sooner.[8]

---

[7]     The prosecutor later argued that "[Norton's report] essentially contain[ed] a 22-page transcript of the interview."  The appellate record does not appear to contain the Norton report that was previously turned over to the defense.

[8]     Norton subsequently testified about his interview of Sharkey on November 13, 2013, as part of the Borgen murder investigation.  He met Sharkey when he went to Borgen's home to inform her family of her death on November 1, 2013.  After Sharkey "reached out" to Norton on November 13, 2013, he met with and interviewed her that day and recorded their conversation without Sharkey's knowledge.  The recorded conversation was played for the jury and, during the interview, Sharkey opined Roberts was involved in Borgen's murder.

Lacher also objected to a purported second discovery violation, asserting the prosecutor improperly withheld text messages obtained from a "dump" of Sharkey's cell phone. The defense reasoned these text messages were impeachment evidence because it showed Sharkey's relationship with her "baby daddy" was different than what she had testified to and contained "exonerating" evidence. Although Lacher acknowledged the errors may have been inadvertent,[9] she argued the late delivery amounted to sufficient misconduct as to warrant immediate dismissal of the case. The prosecutor responded that she had just learned the preceding night that police had a "dump" of text messages from Sharkey's phone. At that point she immediately contacted Lacher and hand delivered this new information that same evening. The prosecutor noted that, at most, the text messages merely demonstrated the level of "drama" involved in the relationship between Sharkey and her "baby daddy," and "in no way" exonerated Roberts.

The trial court once again denied Roberts's motion to dismiss, reasoning it had "reviewed the text messages. You said they were exonerating. I read them. There's nothing exonerating where she claimed that somebody else did it. She may have misrepresented her relationship with her boyfriend and maybe that you can use to show that [s]he's not trustworthy. That's why I will order her back here after you have time to review them all, but there's nothing per se exonerating in the way she identified somebody else that the prosecutor withheld from you." Disagreeing with the court's

_____

9    Lacher, complaining about the late delivery of the materials, stated, "how many things does it take to get to the point where there's such misconduct that it may mean a dismissal . . . . [¶] I'm not blaming—I have no idea. It sounded like . . . we had two lawyers on this case. This particular prosecutor didn't have the case from the get go . . . ."

19

ruling, Lacher stated, "I guess it depends on your definition of *Brady* [*v. Maryland* (1963) 373 U.S. 83] and exonerating" and argued the texts were exonerating by showing Sharkey "absolutely lied about a particular thing." The court maintained its ruling but noted it was an area on which Roberts could elect to cross-examine Sharkey.

2. The Claim of Prosecutorial Error

We review Roberts's assertion of prosecutorial error[10] guided by well-settled principles. A prosecutor's error only violates the federal Constitution when it is so egregious and infects the trial with such unfairness as to cause the conviction itself to be a denial of due process. (*People v. Prieto* (2003) 30 Cal.4th 226, 260 (*Prieto*).) Under the California Constitution, a prosecutor commits reversible error by using " ' "deceptive or reprehensible methods" ' " when attempting to persuade either the trial court or the jury, and it is reasonably probable that without such errors an outcome more favorable to the defendant would have resulted. (*People v. Fuiava* (2012) 53 Cal.4th 622, 679; *People v. Gray* (2005) 37 Cal.4th 168, 215-216.) A defendant's conviction will not be reversed for such misconduct, however, unless it is reasonably probable a result more favorable to the defendant would have been reached without the misconduct. (*People v. Crew* (2003) 31 Cal.4th 822, 839; *People v. Barnett* (1998) 17 Cal.4th 1044, 1133.)

---

10    Because there is no evidence the prosecutor intentionally or knowingly committed misconduct, we agree with the Attorney General that Roberts's claim is more properly characterized as a claim of prosecutorial "error" rather than " 'misconduct.' " (*People v. Hill* (1998) 17 Cal.4th 800, 823, fn. 1 ["We observe that the term prosecutorial 'misconduct' is somewhat of a misnomer to the extent that it suggests a prosecutor must act with a culpable state of mind. A more apt description of the transgression is prosecutorial error."].)

While Roberts's appellate argument regarding prosecutorial error is amorphous,[11] it appears to be premised on a claim that the prosecutor, by not providing the Sharkey CD and the text messages earlier, caused additional erosion in Lacher's relationship with her client and "flustered" her in presenting his case to the jury. (Italics omitted.) However, Roberts does not assert on appeal that he was denied effective representation by counsel at trial, nor has he identified what an unflustered reasonable attorney should have done or not done, much less that (despite any tensions between Lacher and her client) Lacher's actions during trial fell below an objective standard of reasonableness.[12] Instead, he

---

[11] While Lacher framed the claim below as a type of *Brady* violation, Roberts did not argue in his opening brief, and specifically eschews in his reply brief, any suggestion that the tardy delivery of this evidence constituted a *Brady* violation, which would require a showing that "[t]he evidence . . . [was] favorable to the accused, either because it is exculpatory, or because it is impeaching; [the] evidence [was] suppressed by the State, either willfully or inadvertently; and prejudice . . . ensued." (*Strickler v. Greene* (1999) 527 U.S. 263, 281-282.)

[12] Roberts also appears to imply on appeal that the prosecutor's delays in turning over the Sharkey CD and the text messages harmed his right to a fair trial because the delays (1) led to Lacher's August 21, 2014, motion to be relieved as counsel because of Roberts's declining faith in her ability to represent him, and (2) caused Roberts to be angry which led to "outbursts [which] resulted in the court's order that he be chained to the floor . . . ." Certainly, Lacher encountered tension with her client, including his interrupting her and threatening to fire her, but she acknowledged she had represented him "for many years" and "that's his personality [and] I take that with a grain of salt. [¶] . . . [¶] That doesn't bother me."

asserts the prosecutor's alleged errors in tardily delivering the Sharkey CD or the text messages infected the trial with such unfairness as to cause the conviction itself to be a denial of due process. (*People v. Gionis* (1995) 9 Cal.4th 1196, 1214; *Prieto, supra,* 30 Cal.4th at p. 260.)

We are not persuaded that any delay in providing discovery was so significant as to deny Roberts a fair trial. As to the Sharkey CD, any harm from its late delivery was de minimus because (1) the prosecution stipulated the jury could listen to the audio of her interview with Norton in which she expressed her belief Roberts was involved in Borgen's murder; (2) the trial court noted the defense had cross-examined Sharkey about her beliefs as to Roberts's involvement in Borgen's murder; and (3) Roberts has not on appeal identified any avenue of cross-examination or argument the Sharkey CD provided

More importantly, that tension appears *entirely unrelated* to the tardy delivery of the Sharkey CD or the text messages. When Lacher explained the tension in her August 21, 2014, motion to be relieved, she related that the preceding evening she and Roberts had a three-way phone call with an "alibi witness" whom she planned to call. The alibi witness was resistant to testifying and claimed Lacher lied to the witness about having to appear, and the phone call resulted in "screaming and yelling" which led her to hang up. Lacher acknowledged she had to hang up on Roberts, and also expressed concerns over whether she could be "effective because he's questioning me every step of the way," and hence sought to be relieved as counsel in the midst of trial. The court, while acknowledging Roberts was constantly interrupting her, denied the motion to relieve Lacher as counsel and to have Roberts represent himself in propria persona. As to the issue of courtroom restraints, Roberts was ordered restrained after an outburst on August 20, 2014, which led the court to believe he posed a possible danger to the courtroom participants.

On appeal, Roberts does not explain how either his August 20, 2014, outburst or the phone confrontation leading to Lacher's August 21, 2014, motion to be relieved could have been causally related to his discovery that the Sharkey CD or the text messages had not been timely turned over. The fact that the Sharkey CD had not been turned over *first became known* to the prosecutor on August 25, 2014. And it appears the existence of the text messages was unknown to the prosecutor until August 26, 2014. Both revelations occurred days *after* Roberts's phone confrontation and in-court outburst.

that was not otherwise fully available to the defense from Norton's written summary of that same interview, which had been provided to the defense well in advance of trial. As to the text messages, we are convinced any delay in turning them over was insignificant because (1) the trial court noted that its review of the text messages indicated they contained nothing "exonerating," but at most amounted to collateral impeachment of Sharkey's trustworthiness; (2) Roberts had a five-day recess to review the messages and the court indicated it would order Sharkey to appear after that recess for any additional cross-examination that defense counsel wished to conduct in light of these new materials; and (3) Sharkey did appear and was subjected to cross-examination about information obtained from her cell phone. Because the court granted ample time for Roberts to prepare for the additional cross-examination, and because Roberts has not identified any harm from the tardy delivery of the text messages that was not fully cured by the continuance and recall of Sharkey, we reject Roberts's claim the prosecutor's failure to turn over the material at an earlier point in time infected the trial with such unfairness as to cause the conviction itself to be a denial of due process.

3. The Claim of Instructional Error

As an alternative to dismissal or a mistrial, Roberts requested that the trial court address the delays in discovery by instructing the jury with CALCRIM 306.[13] The

---

13     CALCRIM 306 states, in relevant part:
        "Both the People and the defense must disclose their evidence to the other side before trial, within the time limits set by law. Failure to follow this rule may deny the other side the chance to produce all relevant evidence, to counter opposing evidence, or to receive a fair trial.

prosecutor opposed the instruction, pointing out the prosecution had disclosed both the existence of the Sharkey CD (because it was referenced in Norton's report which had been provided to the defense) and the substance of the interview because Norton's report "essentially contain[ed] a 22-page transcript of the interview." As to the text messages, the prosecutor represented she provided it to the defense as soon as she became aware of the information, which was five days before Lacher cross-examined Sharkey on the newly disclosed material. The prosecutor argued the instruction was not warranted unless "a prejudicial violation of the discovery statute" had been shown by the defense, and contended there was no prejudice based on the timing of the disclosures.

The court denied Roberts's request for an instruction. Finding a lack of prejudice as to the Sharkey CD, it reasoned that Norton's report "contained all of the same statement[s]" as the Sharkey CD.[14] The court also found no prejudice as to the text messages, noting that "there really wasn't that much that came in that was things that we didn't know." In addition, the court determined that although the timing of the disclosures was "a little bit more organic than normal, . . . I don't think it rises to the level

---

"An attorney for the (People/defense) failed to disclose: _____ <describe evidence that was not disclosed> [within the legal time period].
"In evaluating the weight and significance of that evidence, you may consider the effect, if any, of that late disclosure." (Boldface omitted.)

[14] The court observed Lacher had used the recording to impeach Sharkey with great effect because, when Sharkey stated she did not recall making certain statements, Lacher used the CD to prove otherwise and force Sharkey to "come clean." Indeed, the court noted the timing of the disclosure of the CD may have "worked out maybe to [the defense's] benefit," and defense counsel conceded, "I can't with a straight face say to some degree that it didn't work out to my benefit."

24

to give [CALCRIM] 306. There was no misconduct that would rise to the level of prejudicial violation of the discovery statute." Roberts now argues that the refusal to give the requested instruction was an abuse of discretion.

Section 1054.1 " 'requires the prosecution to disclose to the defense . . . certain categories of evidence "in the possession of the prosecuting attorney or [known by] the prosecuting attorney . . . to be in the possession of the investigating agencies." ' " (*People v. Verdugo* (2010) 50 Cal.4th 263, 279-280.) Evidence subject to disclosure includes exculpatory evidence as well as " '[r]elevant written or recorded statements of witnesses or reports of the statements of witnesses whom the prosecutor intends to call at the trial.' " (*Id.* at p. 280.) Absent good cause, " 'such evidence must be disclosed at least 30 days before trial, or immediately if discovered or obtained within 30 days of trial.' " (*Ibid.*; § 1054.7.)

If any party fails to comply with the statutory disclosure requirements, the trial court "may make any order necessary to enforce the provisions of this chapter, including, but not limited to, immediate disclosure, contempt proceedings, delaying or prohibiting the testimony of a witness or the presentation of real evidence, continuance of the matter, or any other lawful order. Further, the court may advise the jury of any failure or refusal to disclose and of any untimely disclosure." ( . . . § 1054.5[, subd.] (b).) "Although a discovery sanction may include an element of punishment, the record must support a finding of significant prejudice or willful conduct." (*People v. Bowles* (2011) 198 Cal.App.4th 318, 326; see also Bench Notes to CALCRIM 306 ["While the court has discretion to give an instruction on untimely disclosure of evidence (§ 1054.5, subd. (b)),

25

the court should not give this instruction unless there is evidence of a prejudicial violation of the discovery statute."].)  Thus, where a court's decision on how to instruct with regard to discovery issues is based on a determination as to prejudice, we will not disturb that ruling absent an abuse of the court's discretion.  (See generally *People v. Ayala* (2000) 23 Cal.4th 225, 299.)

Roberts has not demonstrated the trial court abused its discretion in refusing the instruction.  As to the Sharkey CD, the record on appeal contains nothing undermining the court's conclusion that Norton's report contained effectively the same information as was included on the Sharkey CD.  Moreover, Norton's report expressly referenced the CD.  Accordingly, when the prosecution turned over Norton's report it disclosed the CD and its contents.  Because CALCRIM 306 is predicated on the *failure* to disclose evidence, the instruction was inapplicable because the prosecution did not fail to disclose the contents of the CD.

We are equally convinced Roberts has not demonstrated the trial court abused its discretion in refusing the instruction insofar as it was predicated on the timing of the prosecution's delivery of the text messages.  First, Roberts cites no authority suggesting that outside materials which only contain potential impeachment material on tangential matters are even encompassed within the *sua sponte disclosure* requirements of section

26

1054.1.[15] Second, even assuming material providing impeachment on collateral issues is within the ambit of disclosures required sua sponte, the record permits the conclusion that the prosecutor provided the text messages immediately upon learning of their existence. During trial, prosecution witness Officer Joel Tien was asked on cross-examination about various items obtained by police while investigating Sharkey's shooting, including whether he had "anything done to [her cell phone], or did you look at the contacts in the phone or anything like that?" He responded that he "might have gone through her contacts, yes." The next morning, the prosecutor informed the court that "after we left . . . he [Tien] started thinking, 'Well, did I dump it?' " and the prosecutor told Tien to "go look because I don't have that information." Tien subsequently looked, found that text messages had been retrieved from Sharkey's phone, and brought them to the prosecutor, who immediately provided them to the defense that same evening.

On this record, the court properly concluded the prosecutor complied with any discovery obligations because she turned over the text messages "immediately" upon their discovery (§ 1054.7 [disclosures "shall be made at least 30 days prior to the trial . . . . If the material and information becomes known to, or comes into the possession of, a party within 30 days of trial, disclosure shall be made immediately"]), which alone would warrant denial of the requested instruction. Moreover, "courts enjoy a

_____

[15]    Roberts implicitly asserts the prosecutor was required to disclose these materials sua sponte because Roberts cites nothing in the record suggesting she *requested* all information obtained from Sharkey's cell phone or that the court *ordered* such materials produced. (Cf. *People v. Santos* (1994) 30 Cal.App.4th 169, 178 [witness's misdemeanor conviction not " 'exculpatory' " within meaning of section 1054.1, subdivision (e) but must be produced on *request* of defendant].)

large measure of discretion in determining the appropriate sanction that should be imposed . . . . 'The remedies to be applied need be only those required to assure the defendant a fair trial.' " (*People v. Zamora* (1980) 28 Cal.3d 88, 99.) Here, the court had already "cured" any de minimus harm from the tardy revelation of the text messages by providing Roberts an opportunity (after a five-day hiatus in the trial to prepare for the new material) to revisit his cross-examination of Sharkey in light of the text messages, which rendered unnecessary any additional curative actions. We cannot conclude it was an abuse of discretion to refuse the instruction insofar as it was predicated on the timing of the prosecution's delivery of the text messages.

D. *Admission of Gang Evidence*

Roberts challenges the jury's true findings on the allegations that all three offenses were committed for the benefit of a street gang and with the intent to promote, further, or assist in criminal conduct by gang members, within the meaning of section 186.22, subdivision (b)(1). He asserts the court erroneously admitted certain evidence of his affiliation with the WCC to prove the enhancement, and that such evidentiary error cannot be deemed harmless beyond a reasonable doubt.

Cisneros opined that Roberts was a member of the WCC gang,[16] basing his opinion on several indicia. First, over defense objection Cisneros testified he relied on Roberts's admissions (during jailhouse intake interviews in 2004 and 2006) that he was a

---

[16] Cisneros also opined (1) the WCC qualified as a criminal street gang; and (2) crimes like those committed by Roberts would benefit a street gang. On appeal, Roberts does not contest the propriety of those opinions, but instead attacks the propriety of Cisneros's opinion that Roberts was affiliated with the WCC.

28

WCC member. Second, Cisneros testified he found two photographs, apparently posted to a Facebook account around the time that people in Roberts's neighborhood had been visiting a memorial site for Borgen, which depicted Roberts at Borgen's memorial site in the company of WCC members. Third, Cisneros relied on the fact Roberts had a nickname. Finally, Cisneros considered a video he had seen in which Roberts participated with another person (a purported WCC member) in assaulting a fellow inmate (also an alleged WCC member) for whom a "green light" had been purportedly been authorized.

To prove the gang enhancement pursuant to section 186.22, subdivision (b)(1), the prosecution must demonstrate that the underlying felonies (1) were committed for the benefit of, at the direction of, or in association with any criminal street gang; and (2) were committed with the specific intent to promote, further, or assist in any criminal conduct by gang members. (*People v. Ramirez* (2016) 244 Cal.App.4th 800, 818.) The prosecution need not show that the defendant is an active or current member of the gang. (*In re Ramon T.* (1997) 57 Cal.App.4th 201, 207.) Certainly, "gang membership is not an element of the gang enhancement [citation], [but] evidence of defendant's membership [can] bolster[] the prosecution's theory that he acted with intent to benefit his gang, an element it was required to prove." (*People v. Sanchez* (2016) 63 Cal.4th 665, 698-699 (*Sanchez*).)

Cisneros's conclusion that Roberts was a member of the WCC served as the springboard for his opinion that shooting the person who had disrespected Roberts (by "snitching" or by assaulting him with a chain) would benefit the WCC gang and for the

prosecution's argument that Roberts's motives for shooting Sharkey were gang related. A primary evidentiary basis for this conclusion was that Roberts *admitted* he was a WCC member during jailhouse intake interviews in 2004 and 2006.[17] However, our Supreme Court recently concluded in *Elizalde, supra,* 61 Cal.4th 523 that use of a defendant's response to routine questions about gang affiliation during jailhouse intake interviews violated a defendant's Fifth Amendment privilege against self-incrimination.[18] (*Id.* at pp. 536-540.) Accordingly, we must assess whether the court's ruling on Roberts's

---

[17] Cisneros also suggested there may have been two other times Roberts allegedly admitted his association with the WCC. He briefly adverted to a 2002 "documentation card" but the record contains no further information illuminating the genesis of that card, much less what the "card" contained or signified. Cisneros also mentioned an incident in which Roberts was arrested for a battery and, at some undefined time surrounding that arrest, admitted he was a WCC member. Although Cisneros testified that this latter incident occurred in 2001, Roberts's record contains no mention of a 2001 arrest. Even assuming Cisneros was referring to some arrest other than the 2004 and 2006 arrests, the same analysis applicable to the admissions he made in connection with his 2004 and 2006 arrests would appear to apply with equal force to Roberts's admission in connection with any 2001 arrest. Moreover, permitting Cisneros to refer to and rely on these two other "admissions" would *also* appear to run afoul of our Supreme Court's recent decision in *Sanchez* (see discussion, *post*, at fn. 22), and therefore our analysis of the prejudicial impact of the error in admitting Roberts's jailhouse intake statements proceeds from the assumption that references to these other two "admissions" were also improper.

[18] Roberts's opening brief relied on *Elizalde* in arguing the court erred when it overruled his motion in limine to exclude those admissions. The People initially presented no argument that *Elizalde* was in any way distinguishable. However, this court requested supplemental briefing on what evidence in the record, if any, revealed the circumstances surrounding appellant's 2004 and 2006 responses to the jailhouse intake questions and, in light of those circumstances, what impact does *Elizalde,* as well as subsequent cases applying *Elizalde*, including *People v. Leon* (2016) 243 Cal.App.4th 1003 (*Leon*), *People v. Lara* (2017) 9 Cal.App.5th 296 (*Lara*), and *People v. Villa-Gomez* (2017) 9 Cal.App.5th 527 (*Villa-Gomez*), have upon Roberts's claim that his 2004 and 2006 responses to the jailhouse intake questions were erroneously admitted into evidence. The parties have responded and our evaluation is informed by their responses.

30

motion in limine was erroneous under *Elizalde* and, if so, whether the error was prejudicial.

In *Elizalde*, after recognizing that *Miranda* protections apply to questions posed to a defendant during the booking process, our Supreme Court considered whether routine inquiries about gang affiliation posed to a defendant while he was being processed into jail fell within the so-called "booking exception" to *Miranda* as articulated in *Pennsylvania v. Muniz* (1990) 496 U.S. 582 (*Muniz*). (*Elizalde, supra,* 61 Cal.4th at p. 533.) *Elizalde* noted that, under *Muniz*, no *Miranda* warnings are required "for a limited category of booking questions involving biographical data" and admission of a defendant's answers at trial to that limited category does not violate the Fifth Amendment. (*Id.* at p. 531.) However, "[f]or questions outside this limited category, . . . answers given, without an admonition, to questions an officer should know are reasonably likely to elicit an incriminating response may not be admitted in the prosecution's case-in-chief." (*Id.* at pp. 531-532.) *Elizalde* extensively examined *Muniz*, a plurality opinion in which the United States Supreme Court recognized "a 'routine booking question' exception which exempts from *Miranda*'s coverage questions to secure the 'biographical data necessary to complete booking or pretrial services.' [Citation.]" (*Muniz,* at p. 601 (plur. opn. of Brennan, J.).) *Muniz* explicitly cautioned that its recognition of a " ' "booking exception" ' " to *Miranda* " 'does not mean . . . that any question asked during the booking process falls within that exception. Without obtaining a waiver of the suspect's *Miranda* rights, the police may not ask questions, even during

31

booking, that are designed to elicit incriminatory admissions.' [Citations.]" (*Id*. at p. 602, fn. 14 (plur. opn. of Brennan, J.).)

Prior to *Elizalde*, inquiries about gang affiliation had been found to fall within the scope of the booking question exception. In *People v. Gomez* (2011) 192 Cal.App.4th 609, the court interpreted *Muniz* as adopting a *subjective* test because *Muniz*'s language "suggests that the intent of the interrogating officer is more important in evaluating the applicability of the booking question exception than in establishing interrogation generally" (*id*. at p. 629), and therefore the determination of whether a question falls within the booking question required "scrutin[y of] the facts surrounding the encounter to determine whether the questions are legitimate booking questions or a pretext for eliciting incriminating information" (*id*. at p. 630). *Gomez* sought to identify numerous factors for divining the subjective purpose of the interrogation. (*Id*. at pp. 630-631.)

*Elizalde* disapproved *Gomez*'s approach to determining whether routine questions about gang affiliation during jailhouse intake interviews fell within the booking exception. (*Elizalde, supra,* 61 Cal.4th at p. 538, fn. 9.) It explained that *Muniz* "did not purport to overrule the objective standard articulated in [*Rhode Island v.*] *Innis* [(1980) 446 U.S. 291] for custodial interrogation in general. On the contrary, it reaffirmed *Innis*'s definition of interrogation. (*Muniz,* [*supra,* 496 U.S.] at pp. 600-601[ (plur. opn. of Brennan, J.)].) In *Innis,* the court concluded that '[a] practice that the police *should know* is reasonably likely to evoke an incriminating response from a suspect . . . amounts to interrogation.' ([Quoting] *Innis, . . .* at p. 301, italics added.) The design or intent of the police is relevant to the extent it demonstrates what the police should have known about

32

the nature of the questioning.  [Citation.]  Nevertheless, it is not a necessary showing; the test is objective, as the high court has recently observed."  (*Elizalde,* at pp. 536-537.)

Although it declined to delineate the precise scope of the booking exception in all circumstances, *Elizalde* concluded that "questions about gang affiliation exceed it." (*Elizalde, supra,* 6 Cal.4th at p. 535.)  The court reasoned that gang affiliation questions certainly did not conform to the narrow exception contemplated by *Muniz* for basic identifying biographical data which involved "questioning . . . generally unrelated to crime and unlikely to elicit an incriminating response."  (*Ibid*.)  Instead, the questioning had to be assessed under the *Innis* definition of " 'interrogation' " as "questions the police should know are 'reasonably likely to elicit an incriminating response.'  [Citation.]"  (*Id.* at p. 538.)  Applying that test in California, which provides a comprehensive scheme of penal statutes aimed at eliminating criminal activity by street gangs and for which substantial punishment could result, *Elizalde* concluded that posing gang affiliation questions to a defendant were reasonably likely to elicit an incriminating response "even if the deputies' subjective intention was benign."  (*Id*. at p. 540.)

In light of *Elizalde*, several courts held that un-*Mirandized* responses to jailhouse intake questions about gang affiliation could not be used by the prosecution in its case-in-chief to prove a gang enhancement.  (*Leon, supra,* 243 Cal.App.4th at pp. 1015-1016; *Lara, supra,* 9 Cal.App.5th at pp. 335-337; *United States v. Williams* (9th Cir. 2016) 842 F.3d 1143, 1148-1150.)  As in *Elizalde*, however, each of those cases involved a defendant who was in custody following an arrest for a crime that ultimately served as the basis for the gang enhancement.  The responses to the questions asked of the

33

defendant during the booking interview were offered to prove the enhancement. Here, in contrast, Roberts was arrested years earlier for offenses completely unrelated to the charge that now forms the basis for the gang enhancement.

Only one post-*Elizalde* decision has permitted the admission of a defendant's un-*Mirandized* responses to gang affiliation questions during a jailhouse intake interview. In *Villa-Gomez, supra,* 9 Cal.App.5th 527, the court faced an unusual fact pattern. A defendant in custody on a federal immigration hold was asked questions about his gang membership. No *Miranda* warning was given. After the interview, but while he was still in custody on the immigration hold, defendant was involved in a jail fight. He was then arrested and charged with assault and a gang enhancement. (*Id.* at pp. 531-533.) The *Villa-Gomez* court concluded that when a defendant is taken into custody and subjected to un-*Mirandized* questioning but is "not yet charged or suspected of *any* crime—commonly committed for the benefit of gangs or otherwise . . . [n]othing the *Elizalde* court wrote suggests its holding should apply . . . ." (*Id.* at p. 537.)

If *Villa-Gomez* were limited to the unusual circumstances of the case—a defendant in custody but not suspected of any crime—it would barely detain us here. But the opinion appears to endorse a much broader proposition, suggesting that if "the crime for which defendant was prosecuted had not yet been committed at the time he answered the classification deputy's questions, those questions were not reasonably likely to elicit an incriminating response." (*Villa-Gomez, supra,* 9 Cal.App.5th at p. 530.) Seizing on this sweeping language, the Attorney General argues that *Elizalde* "should [not] apply to

34

crimes that have not yet been committed at the time of the inquiry."[19] (*Villa-Gomez,* at p. 537.) Nothing in *Elizalde* supports such a broad exception to the general rule that un-*Mirandized* answers to gang affiliation questions during booking interviews are inadmissible.

*Elizalde* instructs that the court must evaluate gang affiliation questions in the same way it would analyze any other inquiry pursued without the benefit of a *Miranda* admonition and determine whether the questions "were reasonably likely to elicit an incriminating response." (*Elizalde, supra,* 61 Cal.4th at p. 538.) The primary factor in making this determination is California's "comprehensive scheme of penal statutes aimed at eradicating criminal activity by street gangs" by imposing enhancements for gang-related crimes. (*Ibid.*) The Supreme Court then noted that the defendant "was charged with murder, a crime frequently committed for the benefit of criminal street gangs." (*Id.* at p. 540.)

It is not entirely clear whether the Supreme Court intended that the crime with which the defendant is charged at the time the gang membership statements are made be part of the analysis, or merely an illustration of the statements' incriminatory nature. Given the "comprehensive scheme of penal statutes," (*Elizalde, supra*, 61 Cal.4th at p. 538), an admission of gang membership always carries with it the incriminatory

---

19    A defendant's statement obtained in violation of *Miranda* cannot be used as part of the prosecution's case-in-chief. The People cite no authority (other than *Villa-Gomez*) for the proposition that an admission which would otherwise be *inadmissible* under *Miranda* had it been offered against the defendant in connection with the original arrest becomes *admissible* after the passage of sufficient time.

prospect of future enhanced punishment.[20]  But even if it was meant to be a subsidiary factor in the analysis, and unlike the defendant in *Villa-Gomez* who was "not yet charged or suspected of *any* crime" (*Villa-Gomez, supra*, 9 Cal.App.5th at p. 537), Roberts *was* under arrest when he was questioned by intake deputies both in 2004 and 2006.[21] Accordingly, we conclude the jailhouse intake gang-related questioning that followed those arrests was "reasonably likely to elicit an incriminating response." (*Elizalde, supra,* 61 Cal.4th at p. 538.)  In the absence of a *Miranda* warning, Roberts's responses to those questions could not later be used against him.

Because we conclude the evidence regarding Roberts's 2004 and 2006 admissions was improperly admitted at trial, we must assess whether the error was prejudicial. Ordinarily, the erroneous admission of evidence is reviewed for prejudice under the standard described in *People v. Watson* (1956) 46 Cal.2d 818, which requires reversal only if the defense shows it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error.  (*People v. Wilkins* (2013) 56 Cal.4th 333, 351.)  However, when the error involves a defendant's federal constitutional rights, such as a violation of the privilege against self-incrimination, the

[20]     The California Street Terrorism Enforcement and Prevention Act (§ 186.20 et seq.) was first enacted in 1988.  (See Stats. 1988, ch. 1256, § 1.)  Here Roberts's admissions of gang ties occurred long after there were significant penal consequences associated with gang membership.  We have no occasion to comment on whether use of similar statements made before 1988 would violate *Miranda*.

[21]     In 2004, law enforcement officers intervened in a verbal altercation between Roberts and an unidentified man.  Roberts gave officers a false name and fled.  In the ensuing chase, one officer suffered injuries including a broken wrist.  The record does not reflect the nature of the 2006 arrest.

error is reviewed for prejudice under the standard described in *Chapman v. California* (1967) 386 U.S. 18, 24. Under that test, the prosecution must prove beyond a reasonable doubt that the erroneous admission of Roberts's jailhouse intake statements did not contribute to the guilty verdict. (*Elizalde, supra,* 61 Cal.4th at p. 542.) " 'To say that an error did not contribute to the ensuing verdict is . . . to find that error unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record.' " (*People v. Neal* (2003) 31 Cal.4th 63, 86.) This requires that we make a judgment about the significance of the statements to reasonable jurors, when measured against the other evidence considered by the jurors independently of those statements. (*Yates v. Evatt* (1991) 500 U.S. 391, 403-404 [determining whether an instruction providing for an unconstitutional presumption did not contribute to the verdict calls for "a judgment about the significance of the presumption to reasonable jurors, when measured against the other evidence considered by those jurors independently of the presumption"], disapproved on other grounds *Estelle v. McGuire* (1991) 502 U.S. 62, 72, fn. 4.)

We cannot conclude the erroneously admitted jailhouse intake statements were harmless beyond a reasonable doubt. We first note that the statements were a form of confession to a critical element. Our Supreme Court recognized in *People v. Cahill* (1993) 5 Cal.4th 478 "that confessions, 'as a class,' '[a]lmost invariably' will provide persuasive evidence of a defendant's guilt [citation], that such confessions often operate 'as a kind of evidentiary bombshell which shatters the defense' [citation], [and therefore] that the improper admission of a confession is much more likely to affect the outcome of

37

a trial than are other categories of evidence, and thus is much more likely to be prejudicial . . . ." (*Id*. at p. 503.)

Thus, we must "make a judgment about the significance of [the confession] to reasonable jurors, when measured against the other evidence considered by those jurors independently of [the confession]." (*Yates v. Evatt, supra,* 500 U.S. at p. 404.) Here, the "other" indicia of Roberts's affiliation with the WCC was at best both weak and equivocal. The first indicia—that Roberts had a nickname—is unremarkable, particularly when viewed through the prism of Cisneros's concession Roberts had no *other* indicia of gang association, such as gang tattoos or involvement in placing gang graffiti in WCC territory. The second indicia—that Roberts attended a memorial honoring his deceased girlfriend at which he was photographed with three WCC members who had grown up in the same neighborhood—is both marginal and equivocal evidence in buttressing Cisneros's opinion of his gang membership.[22] Indeed, Cisneros admitted that although he spent 18 months as a gang detective assigned to monitoring just the WCC and had (prior to that time) been assigned to areas involving extensive contacts with the WCC, Roberts had never come to his attention as a WCC member until just a few weeks before the Sharkey shooting. Even then, Roberts only came "across [his] radar" *because* Roberts attended the memorial and Cisneros saw the two Facebook photos of Roberts in the company of WCC members at that memorial. The final indicia—the fact Roberts

_____

[22]    Cisneros also acknowledged that, while the Facebook photos depicted Roberts in the *company* of these three individuals who were wearing gang clothing and "making" gang signs, Roberts was apparently *not* similarly attired nor was he obviously depicted "making" gang signs.

38

participated in a jailhouse fight allegedly involving WCC members—certainly provided some evidence that he associated with WCC members, but there was no evidence that the fight was definitively gang related rather than being motivated by personal animus.[23]

We also note that the People cite no evidence about *how* the crime was committed to suggest that Roberts assaulted Sharkey for the benefit of, at the direction of, or in association with the WCC. Instead, the evidence appears to show Roberts acted alone in the assault, said nothing during the incident to indicate he was acting on behalf of the gang, and was apparently not clothed in attire associated with the WCC. Moreover, the evidence of Roberts's motive for the attack was at least equally susceptible to the interpretation that Roberts was motivated by his personal animus toward Sharkey, arising both from her accusations against him in Borgen's murder and her assault on him with the chain.

---

[23] Although we need not decide the issue, the Supreme Court's recent decision in *Sanchez, supra,* 63 Cal.4th 665, calls into question whether Cisneros's suggestions—that the fight involved an alleged WCC member assaulting another alleged WCC member, and that the motivation for that fight was "there was a green light for [the latter person] to be assaulted…[to] put[] him in his place for what he had done"—are even admissible under California law. Both suggestions appear to be rooted in "case-specific" statements, which are arguably inadmissible under the doctrine developed by *Crawford v. Washington* (2004) 541 U.S. 36 and its progeny. *Sanchez* adopted the following rule: "When any expert relates to the jury case-specific out-of-court statements, and treats the content of those statements as true and accurate to support the expert's opinion, the statements are hearsay. It cannot logically be maintained that the statements are not being admitted for their truth. If the case is one in which a prosecution expert seeks to relate *testimonial* hearsay, there is a confrontation clause violation unless (1) there is a showing of unavailability and (2) the defendant had a prior opportunity for cross-examination, or forfeited that right by wrongdoing." (*Sanchez,* at p. 686.) Here, however, even if Cisneros's suggestions were properly admitted, we cannot conclude the erroneous admission of the most damning evidence—Roberts's alleged statements he was a WCC member—was harmless beyond a reasonable doubt.

On this record, the only evidence supporting the gang enhancements was Cisneros's opinion that Roberts, *as a WCC member*, was animated by gang mores and interests to attack Sharkey. We conclude the prosecution has not demonstrated the *other* evidence of Roberts's WCC membership was so compelling or uncontradicted that we can be satisfied beyond a reasonable doubt that the erroneous admission of Roberts's confession that he was a WCC member did not contribute to the jury's true finding on the section 186.22, subdivision (b)(1) enhancements.[24] (*Sanchez, supra*, 63 Cal.4th at pp. 698-699 [error on gang affiliation evidence not harmless beyond a reasonable doubt]; cf. *Elizalde, supra,* 61 Cal.4th at p. 542 [error harmless under *Chapman* where multiple uncontroverted witnesses testified to defendant's gang membership and detective testified to multiple manifestations of allegiance to gang by defendant].)

## DISPOSITION

The true findings on the Penal Code section 186.22, subdivision (b)(1) enhancements are reversed. The judgment of conviction is otherwise affirmed. The matter is remanded to the trial court, where the People shall have 60 days from the date of the remittitur in which to file an election to retry defendant on the reversed gang enhancements. Following retrial, or if the People elect not to retry the enhancements, the

---

[24]  At the same time, we reject any contention that erroneous receipt of Cisneros's testimony about Roberts previously admitting gang membership somehow mandates reversal of the convictions on the substantive offenses because the gang evidence allowed the prosecution to bootstrap support for an otherwise weak case. There was compelling evidence from multiple sources indicating Roberts was the shooter, and evidence of Roberts's connection to the WCC would have been received even in the absence of his statements in the jailhouse intake interviews.

trial court shall resentence defendant and prepare an amended abstract of judgment consistent with this disposition and send the amended abstract to the Department of Corrections and Rehabilitation.  (See *Lara, supra,* 9 Cal.App.5th at p. 338.)


DATO, J.

WE CONCUR:


McCONNELL, P. J.


AARON, J.